'Mr. Justice SWAYNE
 

 delivered the opinion of the court.
 

 It appears from the record that this action was founded
 
 *549
 
 upon a eontractenfered into.on the 14th.of September, 1868, between Hall, one of the plaintiffs in error, and Coppell, the defendant in error. It was agreed that Hall should furnish Coppell 1169 bales of cotton, — 789 bales at B. L. Mann’s place, about one mile' from Areola station on the Jackson railroad, 47 bales at Gilman’s, near Tangepahow, and the residue in the parish of St. Helena, East' Eelieiana, and in Williamson and Amity counties, Mississippi. Coppell agreed to cause the cotton to be_“ protected ” a,nd transpprted to New Orleans, aud disposed of to the best advantage, paying to Hall the actual cost' of the- cotton and two-thirds of the ■ net profits, “ after deducting freights, taxes, &c.,” without commissions, retaining one-third~of the profits as his compensation-. It was further agreed, that if any of the cotton should be stolen, burned, or otherwise destroyed, Hall should be exonerated to that extent; aud that Coppell should pay Hall, or cause him to be paid at Areola, sums approximating to the value of his interest, as the cotton was removed; such sums .to be indorsed'on the notes given by Coppell'to Hall; one for $818,850.00, and the other for $57,000.00, both, bearing even date with the contract.
 

 Coppell was the plaintiff in the court below. His petition avers :■ That he is a subject of Great Britain, and a resident in that kingdom; That Hall, the plaintiff in error, resides in the city of New Orleans, and Mann, the other plaintiff in error,'at Areola station, in Louisiana; That Hall and Mann delivered to him 1189 .bales of- cotton, of which 789 bales were on the plantation of Mann, at Areola, and the remainder at various other places mentioned in a schedule annexed to the petition; That he caused the 789 bales to be branded/with his initials and his private mark; That ho had-appointed Mann his agent to take charge of the cotton in his name and for his benefit, and that Mann acted, as his agent accordingly; That, by reason of the-war, he was unable to bring the cotton to market, but that he had expended large sums' and much time and labor in■“protecting” it; That, at "the time of entering into the contract, he executed the two notes mentioned, which were to be'held by Halí as
 
 *550
 
 security for the proceeds of the cotton, and that these notes . were still in the possession of Hall; That he was then able and desirous to bring the cotton to New Orleans for sale, and had made a demand for it on Hall and Mann, but that they had neglected and refused to deliver it, to his damage in the sum of $50.,000.
 

 He subsequently filed an amended petition, in which he sets forth: That the contract between himself and Hall was entered into by the permission of the major general commanding the Department of the Gulf, expressed in general orders — Coppell being then engaged in business in New Orleans, and Hall living in that city; That the notes, mentioned in the-contract, are held by Hall and Mann, or have been-transferi’ed'by them to other parties;, That, on the 14th of .Septembei’, 1863, Mann sold and delivex’ed to Hall 1169 bales of cotton, then on the plaixtation of Mann; axxd that Hall,- in part execution of his contract, designated and ti’ansferred this cotton to Coppell; That Coppelb“ protected” the cotton, and that Mann continued to hold it irx trust for him aiid Hall, until,the Confederate ai’mies, under the command of Geuex’al Richard B. Taylor, surrendered to the forces of the United States, when Mann and Hall, colluding to defeat the trust, refused to allow Coppell to bi'ing the cotton to New Orleans, aceox’ding to the contract; That this cotton is ■ the same which was sequestei’ed irx this suit, and that he is entitled to the possession of it.
 

 The original and supplemental answers of Hall and Mann set up the following defences: That the cotton was situated in territory under the control of the rebel authorities, and that the conti’act was entered into there; that the object of the contract was the protection of the cotton, within the rebel.lines, by Coppell, as the British consul, and its transportation to New Orleans during the war then raging; that the contract was thus in violation of the laws of the United States; of the neutral obligations of the plaintiff, as British consul and a I’esidenf-of the United States; and of public polipy; and was null and void; that the plaintiff lost all right and interest in the contract by leaving Louisiana before the
 
 *551
 
 restoration of peace, and' that the defendants .were thereby released from all liability upon the contract; that, if the contract should ,be held valid, the defendants claimed damages, by way of reconvention, for breach of the contract by the plaintiff, in neglecting to remove the cotton to New Orleans, and to sell it as he had agreed to do.
 

 In replyto the reconventional demand, the plaintiff replied that he’was the consul of her British Majesty; that he did protect the cotton from all seizures which his agreement included; and that, as soon as the military situation permitted, hé was ready and willing' to perform all the stipulations of his agreement, ánd tendered the necessary means for the transportation of the cotton to New Orleans; which tender the defendants declined.
 

 ■Upon -this state of the pleadings the cause proceeded to trial. The parol evidence is not as fully set out as should have been done; but the controlling facts sufficiently appear.
 

 The plaintiff gave in evidence the military orders of. the department commander of the 7th of March and the 3d of September, 1863. By these orders the trade of the Mississippi, within the Department of the Gulf, was permitted, subject to such restrictions only as should be necessary to prevent the supply of provisions and munitions of war to the enemy. The products of the country were authorized to be brought to New Orleans, and other designated points within • the military lines of the United States, and to be sold by the proprietors or their factors “ for the legal currency of the United States, without restriction or confiscation.” New Orleans,was then in the military possession of the United States.
 

 The cottoR was all within the rebel lines. This state of things continued until the surrender of the rebel forces under General Taylor. Consular certificates were given by the plaintiff', each setting forth that the cotton therein re-’ ferred to was “ the property of a British subject.”
 

 In the progress of the trial numerous exceptions were taken by the defendants. Some of them relate to the rejection of testimony; the, residue to instructions given, or
 
 *552
 
 refused. The view which we take of the case renders it necessary to consider only those which relate to the legdlity of the contract. They are the 2d, 7th, 8tb, and 9th. The 2d, ,8th, and 9th, taken together, show that thé court, in instructing the jury, substantially affirmed the following . propositions:
 

 ■That the demand for reconvention, set up' by the defendants, “ cured any nullity or illegality in tue contract, if any existed, and that,1 under the pleadings, the plaintiff might recover, notwithstanding such illegality.”
 

 That the military orders, then in force, authorized .and gave validity to the contract.
 

 That Hall and the plaintiff both residing in New Orleans, the contract was valid under the law of nations.
 

 It appears, by the 7th bill of exceptions, that the defendants prayed the court to-instruct the jury, that if the cotton, referred to in the contract, was' at the ti,me of its sale situated in territory which was under the permanent control of the Confederate forces, the same was enemy property; and that if it was in the contemplation of the parties that the plaintiff’, acting as British consul at New Orleans, hr as a British subject resident in New Orleans, shonld extend British protection oyer said cotton, and should “issue his official certificates, as British consul, that the1 cotton-was the property óf a British subject, for the protection of the same within lines occupied by.the enemy during the war; and that such protection formed a part of the consideration of the contract; then the contract was contrary, to the laws of the United States, to the law of nations, to public policy, and to' good morals, and that said contract was, therefore, -hull and void.” The court refused to give this instruction. The reason assigned for the refusal-was, “that the proof was that both parties were1 residents and domiciled in New. Orleans; and that the court could not charge upon a sup-, posed case which did not exist.”
 

 . It does -not appear'to’us that this, objection to giving thp instruction asked was well, taken... Conceding the fact that th.e parties did both reside in New Orleans, the instructio'ns
 
 *553
 
 met exactly the exigencies of the ¡case. If the defendants' W.ere. right as Ho the legal views upon .which they insisted, the instruction should have been given; If they were'wrong ip those views, it was properly refused.' The point thus presented will be considered in connection with those arising upon the instructions which were given.
 

 Consuls'are approved and admitted by the'local-sovereign. If guilty of illegal or improper conduct, the exequatur which has been given may be revoked, and they may be punished, or sent out of the country, at the option of the offended government.' In civil and criminal cases, they are subject to the local law in the same manner with other foreign residents owing a temporary allegiance to the state.
 
 *
 
 A trading consul, in all that concerns his trade, is liable in the same way as a native merchant.
 
 †
 
 The - character of consul does not give any protection to that of merchant when they are united in the same person.
 
 ‡
 

 By the terms of the. contract, Hall was to -“furnish” the cotton to Coppell. It was all within the rebel lines, and was, therefore, enemy property. Coppell was to cause it to be “ protected.” If there could be any doubt about .the’, meaning of this phrase as used in.'the contract, it is dispelled by the conduct of Coppell in issuing the consular certificates, that the cotton which they covered respectively was “the property of a British subject.” He was to receive the cotton in the rebel territory, to. make an advance upon it there, to transport jt to New-Orleans, and there, to sell it for the benefit of the contracting parties.' The contract was one of factorage. Aside from the question of illegality, it is clear' that .no title passed to Coppell. He was to have, and had' no share in the acquisition of the cotton by Hall. His duties were to protect it; to receive it; to advance money upon it; to transport it; to'Sell1 it, and to account to Hall for his share 'of the proceeds. . • ' '
 

 
 *554
 
 It was doubtless expected that the insurgent authorities and the insurgent population would respect the rights of the “British subject.” If the surging tide of war should sweep back the rebel arms, and the national forces should penetrate to the localities of the cotton, the custodian would' be ready, in every instance, to produce the consular certificate.
 

 These certificates, even if issued in good faith, were, nullities, and could give no immunity; yet it might well be hoped that the authorities'of the United States, instead of ■'seizing the
 
 cottonjure
 
 belli, and disposing of it according to the act relating to captured and abandoned property, would
 
 ex gratia
 
 waive their rights, and yield- up the property to_the ostensible British owner, whose claim was fortified by such a muniment of title. The parties intended to delude and defraud the United States. The means used were'the certificates issued by the consul.
 

 When the contract w’as entered into the rebellion had become a civil war of large proportions. Important belligerent rights were conceded to the insurgents by the government of the nation. The war, in rpany of its aspects, was conducted as if it had been a public one with a.foreigu enemy.
 
 *
 
 When international wars exist, all commerce between the countries of the belligerents, unless permitted, is contrary,to public policy, and all contracts growing out of such commerce are illegal. Such wars are regarded not as, wars of the governments only, but of all the inhabitants of their respective countries. The sovereign may license trade, but in so‘far as.it is done, it is a suspensiQn of war, and a return to the condition of peace. It is said there cannot be, at the same time, war for arms and peace for commerce. The sanction'of the sovereign is indispensable for trade. -A state of war
 
 ipso facto
 
 forbids it. The government only can relax the rigor of the rule.
 
 †
 

 During the late civil war fhe, subject was"regulated by
 
 *555
 
 Congress. The 5th section of the act of July 16th; 1861, authorized the President to proclaim any State, or jjart of a State, in,/a condition of insurrection, and it declared that .thereupon all commercial intercourse between that territory and the citizens of the rest of the United States should be unlawful so long as hostilities should continue, and that all goods and merchandise, coming from such territory into other parts of the United States, and all proceeding to such territory by land Or water, and the vessel or vehicle conveying them, should be forfeited. It was enacted, in a proviso that the President might permit commercial intercourse with any part of such territory “in such articles, and for such-time, and by such persons” as he might deem- proper, and that “ such intercourse, so far as' by him licensed,” should be “ carried on
 
 only in pursuance of rules and regulations prescribed by the Secretary of the Treasury.”
 

 On the 10th of August, 1861, the President issued a proclamation declaring the inhabitants of the rebel States — including Louisiana and Mississippi — in a state of insurrection. Certain local exceptions, not necessary to be stated,' were made.
 

 By a proclamation of the 31st of March, 1863, it was declared that the inhabitants of the same States, with certain local exceptions, of which New Orleans was one, were in a state of insurrection,'and that all commercial intercourse, not licensed, according to .the act before mentioned, “ between those States, the inhabitants thereof,-with the exceptions aforesaid, and -the citizens of other States,” was unlawful, and that all products, goods, and chattels coming from any of the insurrectionary States, “ with the exceptions aforesaid,” of proceeding to “ any of said States, with the exceptions aforesaid, without the license and permission of the President through the Secretary of the Treasury, would, together with the vessel or vehicle conveying the same, be forfeited to the United States.”
 

 By a circular from the Treasury Department of thé 3d
 
 of
 
 July, 1863, it was declared to be the purpose of the department: “3d, to allow no intercourse át all beyond the na
 
 *556
 
 tional and within the rebel lines of military occupation; across these lines there can be no intercourse, except that of a character exclusively military.”
 

 Amongst the treasury regulations framed under the act of 1861, in force when the contract was entered into, was the following:
 

 “ VII. Commercial intercourse with localities beyond the lines of military occupation by the United States forces, is strictly prohibited; and no permit will be granted for the transportation of any property to any place under the control- of insurgents against the United States.”
 

 The military orders, set forth in the record were unwarranted and void. The President alone could license trade with the rebél territpry, and when thus licensed, it could be carried on only in conformity to regulations prescribed by the Secretary of the Treasury. The¡ subject was wholly beyond the sphere of the power and duties of the military authorities.
 
 *
 
 These orders may be laid Out of view. They can in no wise affect the case;
 

 The stipulations in the contract as. to everything Coppell was to do in the rebel territory was contrary to public policy, to the law of nations, to the act of Congress, to the proclamation of the President, and to the regulations of the Treasury Department.
 

 The protection to be given, if effectual, might have deprived the United States of pecuniary means to the extent of the value of the cotton. Withholding from one scale affects the result as much as putting into the other. The objection rests upon the sathe principle as insuring enemy property. This is condemned by all publicists who have written upon the subject, including as well the earliest as the latest. Valin,
 
 †
 
 Emerigon,
 
 ‡
 
 and Bynkershock,
 
 §
 
 are no less emphatic than Wheaton
 
 ǁ
 
 and Phillimore.
 
 ¶
 
 Such, also, is the rule of
 
 *557
 
 the common law.
 
 *
 
 Such contracts are not only illegal and void, but repugnant to every principle.of public policy. The law will not permit the citizen, in the perils of war;, to subject himself to such a temptation to swerve from hi§ duty tb his country. In
 
 Bell
 
 v.
 
 Potts
 
 it was held to be illegal for a British subject, in time of war, without a license, to bring,' even in a neutral ship from an enemy’s port, goods purchased by his agent resident-in the enemy’s country, after the commencement of hostilities. In
 
 Antoine
 
 v.
 
 Morshead
 

 †
 

 an alien in an enemy’s countrydufing war, drew a bill on a British subject, resident in England, and, after peace, sued for the amount of the bill. The same rule was reluctantly applied by Chief Justice Gibbs. It was held that the plaintiff could not recover. . If the course of the transaction had been reyersed, the result would have been the same. The same rule would have been applied in the British courts.
 

 The payment of money by a subject of one' of the belligerents,-in the country of another, is condemned, and all contracts and securities looking to that end.are illegal and void.
 
 ‡
 

 The adjudications of this court have always proceeded tipon the same principles.
 

 In the case of
 
 Brown
 
 v.
 
 The United States,
 
 Mr. Justice Story said that ‘f-no principle was better settled than that all contracts made with-an enemy during war were utterly void!”
 

 In the case of
 
 The Rapid,
 

 §
 

 the' facts were, that an American citizen bought English goods.in England before the war, and deposited them on an island belonging to the English, near the province of Maine. Upon the breaking out of the. war he sent the Rapid from Boston to the island to bring away the goods. .Upon her return she was captured by an American privateer. The goods were condemned as lawful prize. It was held that the vessel, while thus engaged, was
 
 *558
 
 trading with the enemy, and that the goods had acquired the character of enemy’s property. Mr. Justice Story, in. delivering his opinion in thé court1 below, said: “That not' onily all trading, in.its ordinary acceptation, but all communication aud: intercourse with the enemy were prohibited,; That it vvas in no wise important whether the property enr gaged in the inimical communication be bought or sold, or merely transported and shipped. That the contamination of forfeiture was consummate the moment the property became the object of illegal intercourse.’’
 

 In the case of
 
 The Julia,
 

 *
 

 the vessel was condemned only because, on sailing from Baltimore to Lisbon, and returning, she had carried.a license from a British admiral, issued within our territory by a British agent.
 

 In
 
 Griswold
 
 v.
 
 Waddington,
 
 Kent, C. J., said: “The law 'had-,put the sting of disability into'every kind of voluntary communication and contract with an enemy, which is made without the special permission of the government. There is wisdom and policy, patriotism and safety in this principle, and every relaxation of it tends to.corrupt the allegiance of thé subject, and to’prolong the calamities of war.”
 

 The instruction given to the jury, that if the contract was illegal the illegality had been waived by the reconveutional demand of the defendants, was founded upon a misconception of the law. 1 Iti such cases there can be no waiver. The defence is allowed, not for the sake of the defendant, but of the law itself. The principle is1 indispensable to the purity of its administration. It will not enforce what it has forbidden and denounced. The maxim,
 
 ex dolo malo non oritur actio,
 
 is limited by no such qualification. The proposition to the contrary strikes us as hardly worthy of serious refutation. Whenever the illegality appears, whether the evidence comes from one side or the other, the disclosure is fatal to the case. No consent of the defendant can neutralize its effect. A stipulation in the most solemn form-to waive the objection, would be tainted with the vice of the original contract, and void for
 
 *559
 
 the same reasons. "Wherever the contamination reaches, it destroys. The principle to be extracted from all the cases is, that- the law will not lend its support to a claim founded upon its violation.
 
 *
 

 The court below erred in refusing to instruct as prayed, and in the instructions given.
 

 The judgment below is reversed, and the cause will be • remanded to the Circuit Court, with directions to issue a
 

 Venire de novo.
 

 *
 

 Dana’s Wheaton, § 249; 1 Kent’s Commentaries, 53.
 

 †
 

 2 Phillimore’s International Law ccli.
 

 ‡
 

 The Indian Chief, 3 Robinson 27; Arnold
 
 v.
 
 The U. S. Insurance Co., 1 Johnson's Cases, 363.
 

 *
 

 The Prize Cases, 2 Black, 687; Mrs. Alexander’s Cotton, 2 Wallace, 417; Mauran
 
 v.
 
 The Insurance Company, 6 Wallace, 1.
 

 †
 

 Dana’s Wheaton, § 316; 1 Kent’s Commentaries, 68; The Hoop, 1 Robinson, 196.
 

 *
 

 The Reform, 3 Wallace, 632; The Sea Lion, 5 Id. 647; Ouachita Cotton, 6 Id. 521.
 

 †
 

 Liv. 3, tit. 6, art. 3.
 

 ‡
 

 Vol. 1, 128.
 

 §
 

 2 Jurisprudentiæ Pub., ch. 21
 

 ǁ
 

 Dana’s Wheaton, § 317.
 

 ¶
 

 Vol. 3, 109.
 

 *
 

 Brandon
 
 v.
 
 Nesbitt, 6 Term, 23; Potts
 
 v.
 
 Bell, 8 Id. 548; Furtado
 
 v.
 
 Rogers, 3 Bosanquet & Pull. 191.
 

 †
 

 6 Taunton, 237.
 

 ‡
 

 Griswold
 
 v.
 
 Waddington, 16 Johnson, 459, 460.
 

 §
 

 8 Cranch, 155
 

 *
 

 8 Cranch, 181.
 

 *
 

 Morck
 
 v.
 
 Abel, 3 Bosanquet & Puller, 35; Armstrong
 
 v.
 
 Toler, 11 Wheaton, 258; Collins
 
 v.
 
 Blantern, 1 Smith’s Leading Cases, 630, and notes.