B. F. STANLEY, Appellant, *v.* A. LEVY &
J. ZENTNER COMPANY, Respondent

No. 3289

May 1, 1941.                                    112 P. (2d) 1047.

*Clel Georgetta* and *Clyde D. Souter*, for Appellant.

*Platt & Sinai*, for Respondent.

## OPINION

By the Court, DUCKER, C. J.:

This is an action for damages for breach of an oral contract. Appellant and respondent will be called plaintiff and defendant.

Plaintiff is a truck operator and defendant is a California corporation which deals in farm produce and maintains its principal office in the city of Reno, Nevada.

It is, among other things, alleged in the complaint: That plaintiff and defendant, on or about the 30th day of August 1936 at Reno, Nevada, entered into a verbal contract by which plaintiff was to transport by motor truck 600 tons of grapes. That the hauling was to be done within a period of approximately 60 days from the date of the first load, which defendant agreed to have ready at Roseville as soon as possible after the execution of the agreement. That defendant agreed to have approximately 10 tons of grapes at one place in Roseville available for loading each day during the 60-day period and to have employees available to assist in loading and unloading the grapes at Roseville and Reno to

enable plaintiff to make one trip each day from the former to the latter city and return until the total of 600 tons of grapes had been hauled. That the weight of grapes transported would be computed upon the gross weight of grapes and boxes or other containers. That plaintiff was to be paid $6 per gross ton or a total of $3,600, of which total amount the sum of $700 was to be paid by defendant directly to the plaintiff, and the balance of approximately $2,900 would be paid by defendant to R. D. Jenkins of said Reno for and on behalf of plaintiff to apply upon the purchase price of a motor truck which it was necessary for plaintiff to buy in order to comply with the terms of the contract. That pursuant to the agreement plaintiff began the transportation of the grapes on September 9, 1936, and from that date to October 15, 1936, both inclusive, hauled 317,555 pounds or approximately 158.75 tons, for which defendant became indebted to the plaintiff in the sum of $952.50, of which $815.44 has been paid, leaving a balance due of $137.06 for grapes hauled. That on divers dates during the 60-day period of the contract alleged defendant failed to have available approximately 10 tons of grapes each day as agreed and plaintiff was compelled to make some trips unloaded, and on 21 days during that time failed to have any grapes available for transportation; in consequence plaintiff and his truck were compelled to remain idle on those days. That defendant failed to have other employees in loading and failed to have a full load at one place in Roseville, causing plaintiff loss of much time and additional expense. That on or about the 16th day of October 1936 defendant notified plaintiff that there would be no more grapes to haul. That of the total of 600 tons of grapes to be transported, there remained 441.25 tons. That the profit to plaintiff, had he been allowed to complete the transportation, would have been the sum of $2,152.50, for which, together with the balance due of $137.06 for grapes hauled, judgment was prayed for the first cause of

action. Judgment was also prayed for on a second cause of action for loss of time while the truck was underloaded and idle and for additional services and expenses in the amount of $1,179. Defendant answered denying the contract alleged, and set up a counterclaim and cross complaint for $444.01 as a balance due upon an account for goods, wares and merchandise, which was not denied in the reply. The action was tried to the court without a jury. The court found as follows:

II. That the oral contract alleged to have been entered into between plaintiff and defendant, as set out in plaintiff's complaint, has not been proven to the satisfaction of the court, and is not supported by the evidence.

III. That said oral contract, if the same did exist, by its terms was not to be performed within one year from the making thereof, and the contingencies affecting the performance are such that it could not be performed within a year. That neither said contract, if the same existed, nor any other contract whatsoever between plaintiff and defendant, nor any note or memorandum thereof, expressing the consideration therefor, was or is in writing and subscribed by defendant or any of its officers, agents or employees, or by any other person authorized thereunto. The said alleged contract is void under the provisions of the statute of frauds. It is unnecessary to set out other findings.

Judgment was rendered that plaintiff take nothing by reason of the cause of action set forth in the complaint and that defendant be awarded judgment against plaintiff for $441.01.

Plaintiff appeals from this judgment and the order denying his motion for a new trial.

A number of errors have been assigned, but we think the questions of law to be determined are presented by the first four. In their order they are: First, that it was error for the trial court to hold that the verbal contract sued upon was void under the statute of frauds. Sec. 1533 N. C. L. Second, that it was error for the

court to hold that defendant could rely upon the statute of frauds as a defense under the general denial, when the complaint on its face did not show that the contract was not to be performed within a year, and on the contrary, specifically alleged that the contract was to be performed in less than a year, to wit, approximately 60 days. Third, that it was error for the court to hold that the defendant had not waived its right to rely upon the statute of frauds under a general denial, when the defendant did not plead the statute, remained silent throughout all the taking of evidence, and gave no notice whatever that it intended to rely upon the statute of frauds until both plaintiff and defendant had presented all their evidence in chief. Fourth, that it was error for the court to hold that the contract sued upon was within the prohibition of the statute of frauds when there was in evidence a "note or memorandum thereof, expressing the consideration, be in writing, and subscribed by the party charged therewith."

■ A careful study of the evidence convinces us that the trial court was justified in concluding that the contract proved was invalidated by the statute. Plaintiff testified on direct that the oral contract was as alleged in the complaint. His version of it was substantially that on or about the 30th day of August 1936 he and a partner were indebted to defendant in an amount between five and six hundred dollars and that at that time in Reno, Kenneth Watt, general manager for defendant proposed to him that he haul 600 tons of grapes from the vicinity of Roseville, California, to Reno, telling him that if plaintiff could get a truck he would give him a contract for the hauling at $6 per ton. At Watt's suggestion plaintiff opened negotiations with one Jenkins in Reno, a dealer in trucks, for the purchase of one. He was unable to make the required down payment and finally Watt was induced to write the following letter to Jenkins:

"A Levy & J. Zentner
"Receivers, Jobbers, Distributors
"Fruits and Vegetables
"Home Office
"San Francisco, Calif.
"Reno, Nevada, Sept. 1, 1936.
"R. D. Jenkins
"Reno, Nevada.
"Attention Mr. Jenkins:

"In reference to the purchase of International Truck by B. F. Stanley, of the City of Reno, we can assure you that he will have the hauling of 600 tons of wine grapes, the proceeds of which shall be paid to you, less $700 allowance for Mr. Stanley's operating expenses. For your information Mr. Stanley will be paid at the rate of $6 a ton.

"Hoping the above meets with your approval, we remain,

"Very truly yours,
"A. Levy and J. Zentner Company
"K. Watt, Manager."

Whereupon Jenkins executed a conditional contract to plaintiff for the purchase of a truck extending over a period of 18 months and plaintiff began hauling grapes under that oral contract on September 9, 1936. The hauling continued on the dates and in the amounts per load as alleged in the complaint until the 16th day of October when defendant notified plaintiff that there would be no more grapes to haul as alleged therein.

Testifying directly as to the terms of the oral contract plaintiff said: "I was to get 600 tons of grapes from Roseville vicinity, they was not to be right in town, but they were to be 10 tons in a place where I could get a load in one place without travelling around over the country to get it. I was to have help down there to load them. They would pay $6 a ton. We figured it out that I would have 10 tons a day, take me about 60 days to haul them. * * * $700 was to be paid me for expenses

and the balance of $3600 was to go to Mr. Jenkins for payment on the truck."

On the other hand, Watt, acting for defendant and testifying in its behalf said: "Mr. Stanley was hauling grapes, trucking grapes from Roseville to Reno for us, and later on he hauled from Los Angeles. * * * It was understood that he was to haul the next season. * * * He came to my office on several different occasions (August 1936) and asked me if we couldn't work out something where he could do some hauling for us. * * * And the subject came up in regard to the grape haul and that possibly we could work it out so it would be possible for him to haul from Los Angeles and then the next year haul grapes again."

In reference to the letter Watt wrote Jenkins the former testified as follows: "A. The reason that letter was written was due to the fact that Mr. Jenkins wishes to establish Mr. Stanley's credit with the finance people, and that is the reason that letter was written.

"Q. Did he ask you to do this for him?. A. He absolutely did. * * *

"Q. What do you mean when you state then, 'We can assure you that he will have the hauling of 600 tons of wine grapes?" A. That was based upon the period of his contract, his automobile contract.

"Q. Did you have that in mind also? A. I did, if I recall he had an 18 month contract with Mr. Jenkins, or with the finance corporation.

"Q. You felt that during the 18 months period or term of that contract that he should haul the 600 tons? A. I thought so, yes.

"Q. Do you know of any reason why he should not have had 600 tons during that period? A. Not to my knowledge.

"Q. Did you feel confident that you would have 600 tons for him to haul during that period of time? A. I did, barring any unfortunate conditions or such as that.

"Q. But I have reference to the entire period, the 18

months, or whatever the term of the contract? · A. We had no contract.

"Q. What is that? A. I had no contract.

"Q. I have reference to the conditional sales contract with the automobile company. A. What is the question again?

"Q. You felt that you could safely and reasonably assure him 600 tons of hauling during that period of time? A. Yes. * * *

"Q. As I understood from your testimony, Mr. Stanley would be permitted to haul in the International truck for an indefinite period of time? A. That is correct.

"Q. Extending over several grape seasons, depending upon how long he wanted to work? A. That is right." * * *

The following was elicited on cross-examination: "A. I stated that Mr. Jenkins wanted this letter to establish Mr. Stanley's credit. I did it as a favor to Mr. Stanley and that is the reason that letter was written.

"Q. How long did you expect the grape haul, 600 tons, to last? Over a period of how long? A. Well, there is no definite time stated, because if there had been a definite time I would have stated it in the letter.

"Q. But I am asking you now, how long did you expect to get the 600 tons hauled? A. Our object was for him to haul the wine grapes the season of '36, go into the Los Angeles haul, and then back to the grape haul, and then continue on with the Los Angeles haul for an indefinite period.

"Q. How long a period then did you expect the grape haul to last? A. This particular one?

"Q. Yes. A. It never did last any longer than the 15th, to the 1st of November. * * *

"Q. I am asking you how long did you expect to take to get 600 tons of grapes hauled? A. I figured it would take two seasons at least."

We think Watt's testimony and other legitimate inferences which the trial court could draw from the evidence, form a substantial basis for the finding that the oral

conract, if any existed, by its terms was not to be performed within one year from the making thereof. His testimony tends to prove that the hauling contemplated was to be extended over two grape seasons, with intermediate hauling to and from Los Angeles. The oral contract pleaded in the complaint rests entirely on the testimony of plaintiff, but testimony elicited from him on cross examination lends credence to the other view. We quote:

"Q. Did you ever discuss about any other hauling? A. We had a discussion about hauling later, but that had nothing to do with this contract. * * *

"Q. Well, did you have any such conversation at the time you are speaking about until about August 30, 1936? A. About the Los Angeles hauling?

"Q. Yes, about other hauling? A. Yes, we did.

"Q. Well, what was that? What did you say and what did Mr. Watt say? A. He said that after the grape hauling was finished that he would have hauling for me from Los Angeles through the winter. He said it might not start until the grapes were over and then when it did it would last until about the month of June.

"Q. After that? A. Wouldn't be anything come after June. Might be a couple of months there wouldn't be anything until another grape season.

"Q. Then what conversation, if any, did you have as to other hauling in the fall, after this lull of a couple of months? A. Until fall, the Los Angeles haul, that is all we talked about.

"Q. Have any further discussion as to the grape haul in the fall, following the Los Angeles haul? Answer that yes, or no. A. The Los Angeles haul wouldn't wind up until in the spring after it started.

"Q. In the spring? A. Yes.

"Q. Then did you discuss anything further with him after the Los Angeles haul? A. No, he said there would be a couple of months between the Los Angeles haul and the grape haul that he wouldn't have any work to speak of.

"Q. When was that conversation held about the Los Angeles haul? A. I can't exactly say when it was had, I talked with Mr. Watt so many times, practically every day for a couple of months.

"Q. Now, talking about August 30th of 1936; fix exact date in your mind, now when did you talk to Mr. Watt about a Los Angeles haul? A. I think he mentioned the Los Angeles haul at the time we talked about the grape contract, because I asked him what I was going to do with the truck after we got through with the grapes.

"Q. Did you ask him what you were going to do with the truck after you got through with the Los Angeles haul? A. No, I figured that it would be a short time between that and the grape haul — that I could get through for a couple of months."

Testimony of the same tenor was given by Jenkins, the truck dealer who was a witness for plaintiff. On cross examination he testified as follows:

"Q. Did he say that he would take care of the payments for the entire period of this contract? A. Well, according to the earning capacity of the truck it would be very easy, he wouldn't have to have a great deal of hauling to make those payments.

"Q. Who did he (plaintiff) say would give him the hauling for that period of time. A. Levy-Zentner.

"Q. When did he say that Levy-Zentner company, through Mr. Watt, or any one else, told him that he would have the hauling for at least that period of time? A. Mr. Watt told me he would have the hauling.

"Q. What about hauling after the grape contract was over? Was anything said about that? A. We discussed the hauling generally. Mr. Watt said that Levy-Zentner Company had hauling from Los Angeles in the season, and probably some from Sacramento and that there would doubtless be enough hauling to take care of those payments until the grape season commenced again in the fall.

"Q. Did he promise to give him the grapes again in the fall? A. Yes.

"Q. When did he tell you that? A. When we were discussing the possibility of paying for this truck. We went over this very thoroughly from one end to the other, specifically to see that Mr. Stanley could make these payments and we would get our money for the truck."

We have not undertaken to set out in detail the evidence bearing on the issue, but enough has been stated to show the binding nature of the findings of the lower court. Its conclusion as to the applicability of the statute was not erroneous.

"In the following cases every agreement shall be void, unless such agreement, or some note or memorandum thereof, expressing the consideration, be in writing, and subscribed by the party charged therewith: First, every agreement that, by the terms, is not to be performed within one year from the making thereof. * * * " Sec. 1533 N. C. L.

This court in Girton v. Daniels, 35 Nev. 438, 129 P. 555, laid down the rule that an oral agreement to bear one-third of the expenses of developing a mining claim covered by a two-year lease, was not void under the statute of frauds, where the lease could have been terminated by the act of the parties within one year according to its specific provisions and without violation of its terms.

Plaintiff contends that the rule announced is established by universal authority and is applicable to the facts of this case. We agree that an oral contract which is capable of being fully performed within a year from its execution, is not within the statute of frauds. If, from the terms used, however, the agreement is not to be performed within a year, the statute renders the contract void. This is the exact import of the statute. This intention may appear affirmatively either by express agreement or by necessary implication from the

character or subject matter of the contract and surrounding circumstances. The former rule needs no citation of authority for its existence, and the latter needs but little. We concede, as plaintiff contends, that the great weight of authority holds that an oral agreement which is merely unlikely to be performed, or simply not expected to be performed within a year from its execution, is beyond the reach of the statute. The rule is clearly stated in Browne on the Statute of Frauds, page 327, sec. 273, 4th Ed., where the author says:

"The result (of decisions) seems to be that the statute does not mean to include an agreement which is simply not likely to be performed, nor yet one which is simply not expected to be performed, within the space of a year from the making; but that it means to include any agreement which, by a fair and reasonable interpretation of the terms used by the parties, and in view of all the circumstances existing at the time, does not admit of performance according to its language and intention, within a year from the time of its making."

Plaintiff cites cases to the effect that if it is possible for an oral agreement to be performed within a year it is not within the statute and claims that the agreement involved is subject to that contingency. We think that the possibility of performance which would take an agreement out of the statute of frauds must be such as could fairly and reasonably be said to have been within the contemplation of the parties. An unforeseen or remote possibility will not rescue the agreement from invalidity. Answering plaintiff's claim in this regard, we quote again from the above authority:

"Where the manifest intent and understanding of the parties, as gathered from the words used and the circumstances existing at the time, are that the contract shall not be executed within the year, the mere fact that it is possible that the thing to be done may be done within the year, will not prevent the statute from applying. Physical possibility is not what is meant when it is

said that if the verbal contract may be performed within the year it is binding. Or, to speak exactly, it is not enough that the thing stipulated may be accomplished in a less time; but such an accomplishment must be an execution of the contract according to the understanding of the parties." Browne on Statutes of Frauds, supra, 334, sec. 281.

See, also, White v. Fitts, 102 Me. 240, 66 A. 533, 15 L. R. A. (N. S.) 313, 120 Am. St. Rep. 483; Herrin v. Butters, 20 Me. 119; Kentucky Utilities Co. v. Hurst, 207 Ky. 448, 269 S. W. 525; 27 C. J. 180 and cases cited in note 2. In Herrin v. Butters, supra, the court said: "We are not to inquire what, by possibility, the defendant might have done, by way of fulfilling his contract. We must look to the contract itself, and see what he was bound to do; and what, according to the terms of the contract, it was the understanding that he should do. Was it the understanding and intention of the parties, that the contract might be performed within one year? If not, the case is clearly with the defendant."

Plaintiff's testimony to the effect that it was possible to haul the 600 tons of grapes in approximately 60 days, if defendant had lived up to his agreement, was rejected by the trial court. Watt's version was accepted. From the latter's testimony it was apparent that it was the understanding that the contract was not to be performed within one year from the time it was made. It contemplated, as heretofore pointed out, at least two grape seasons. This, perforce, by the laws of nature would require more than one year for completion. Moreover, Watt's testimony tended to show that it was impossible to complete the hauling of 600 tons of grapes in less than two grape seasons.

The contract proved was void under the statute unless validated by the said letter written by Watt to Jenkins.

■ The letter was written by defendant's authorized agent and there is no controversy over its being addressed to a third party. The question is as to its

sufficiency as a note or memorandum to prevent the interposition of the statute. It is the consensus of judicial opinion that such writing must contain all the essential elements of the contract. The substantial parts of the contract must be embodied in the writing with such a degree of certainty as to make clear and definite the intention of the parties without resort to oral evidence. Manufacturer's Light & Heat Co. v. Lamp et al., 269 Pa. 517, 112 A. 679; Seymour v. Oelrichs, 156 Cal. 782, 106 P. 88, 134 Am. St. Rep. 154; Mentz v. Newwitter, 122 N. Y. 491, 25 N. E. 1044, 11 L. R. A. 97, 19 Am. St. Rep. 514; Snow v. Nelson, C. C., 113 F. 353; 25 C. J. sec. 318; 25 R. C. L. 645, sec. 276; 2 Williston on Contracts, Rev. Ed. 1619, 1622.

■ The following formula is stated in Restatement of Law Contracts, sec. 207:

"A memorandum, in order to make enforceable a contract within the statute, may be any document or writing, formal or informal, signed by the party to be charged or by his agent actually or apparently authorized thereunto, which states with reasonable certainty, (a) each party to the contract either by his own name, or by such a description as will serve to identify him, or by the name or description of his agent, and (b) the land, goods or other subject-matter to which the contract relates, and (c) the terms and conditions of all the promises constituting the contract and by whom and to whom the promises are made."

■ Tested by the rule stated it will be seen that the letter is deficient in several respects. For instance, it is alleged in the complaint and plaintiff sought to prove, that the weight of the grapes transported would be computed upon the gross weight of the grapes and boxes or their containers. This was contradicted by defendant, and Watt testified that the $6 per ton was to be paid on the net weight. Whether it was to be net or gross would have considerable bearing on the profits and was an essential element of which no mention is made in the

letter. No mention is made in the letter that part of the price for the hauling was to be made to a third party. Further, the time of performance was a substantial part of the agreement and as to this the letter furnishes no evidence. The note or memorandum must evidence the agreement of the parties. We hold that the letter in this case does not take the agreement out of the statute of frauds.

Now as to the contention that defendant was not entitled to rely on the statute of frauds as a defense.

■ We do not understand plaintiff to deny, and indeed he could not, that, as a general rule a party may rely upon the statute of frauds under a general denial in the answer. This court recognized this general rule in Dixon v. Pruett, 42 Nev. 345, 177 P. 11, 13, declaring: "The statute of frauds may be relied upon as a defense under a general denial."

This statement is supported by ample authority. 25 R. C. L. 745, 746, sec. 397. 27 C. J. 369, 370, sec. 370 and cases cited in note 14 on latter page. Dunphy v. Ryan, 116 U. S. 491, 495, 6 S. Ct. 486, 26 L. Ed. 703.

■ Plaintiff's position in this respect is that such defense is not available because the complaint does not show the contract was not to be performed within a year. In this situation, he claims, that to be available it must be specially pleaded. He cites authority in support of his position. We do not agree. No good reason appears why a denial of the agreement would be more efficacious to invoke the rule of the statute appearing· on the face of the complaint, than when it does not. In fact, the logic of the situation would seem to be other-wise, for denying facts in the complaint which state a contract within the statute of frauds would be in effect denying the defense. A demurrer would seem more appropriate.

It is claimed that the case of Dixon v. Pruett, supra, sustains plaintiff's position in this regard. And the following language on page 354 of the opinion in 42 Nev.,

on page 13 of 177 P., is relied on: "If the illegality of the contract sued on appears on the face of the pleading counting on it, its illegality is left a live question to be dealt with by the trial court without a formal plea of facts showing its illegality."

We are convinced that the above statement was unnecessary to a determination of the questions involved. It is therefore of no value as a precedent on this point. Moreover, the case of Coppell v. Hall, 7 Wall. 542, 19 L. Ed. 244, cited in support of the statement does not sustain it. On the contrary the court said, 7 Wall, on page 558; 19 L. Ed. 244: "Whenever the illegality appears, whether the evidence comes from one side or the other, the disclosure is fatal to the case."

The case of Levy v. Ryland, 32 Nev. 460, 109 P. 905, is not in point on the question. In that case there was no answer. A resulting trust was alleged in the complaint and the contract showing the same was admitted by the demurrer. In this situation the court was of the opinion that the statute of frauds could not be raised by demurrer, but to be successfully invoked must be pleaded in the answer. The case is cited in 27 C. J. 371 in note 17, as authority for a rule that where the making of a contract is expressly admitted, or there is a failure to deny the same, the rule as generally stated is that, if the party relying upon the statute fails to set it up specially in his pleadings, he cannot have the benefit of the statute. No such rule is applicable in the instant case, for the contract is denied in the answer.

There is no merit in the contention that defendant waived its right to rely upon the statute of frauds by not claiming its benefit until both plaintiff and defendant had presented all their evidence. It was invoked by a proper pleading, to wit, a denial of the oral agreement alleged. The defendant was not called upon to object to plaintiff's testimony tending to prove such an agreement. Objections would have been vain acts. It was not until all of its testimony tending to prove a contract

within the statute was in that defendant was in a position to urge the defense of the statute. Chambers v. Kirkpatrick, 142 Wash. 630, 253 P. 1074, 1076. In the above case the court held that the defense of the statute was not waived by failure to raise the question until the testimony of an oral agreement had all been received. The court said:

"Appellant further contends that if the statute applies, the respondent had a right to waive it, and by his conduct at the trial did waive it. He bases this argument upon the fact that the question of the statute of frauds was not raised by respondent until all the testimony was received showing the oral agreement, and that he made no objection to the receipt of such testimony. It is possible that the rule contended for by appellant might apply under statutes which provide that contracts such as that involved here shall not be enforceable unless in writing; but our statute is broader than most others and says that any such agreement 'shall be void' unless in writing. * * * This being the situation, the respondent had a right to raise the statute of frauds at any time during the trial."

How could the defendant have objected to plaintiff's testimony to prove an oral contract on the ground that it tended to prove a contract within the statute? A different situation would have existed if the prohibition of the statute appeared on the face of the complaint and the defendant made no objection to the proof of the agreement by parol. Most of plaintiff's cases cited on this contention involved the latter situation. Plaintiff's other assignments of error are without merit.

The judgment and order denying the motion for a new trial are affirmed.

ON PETITION FOR REHEARING

June 24, 1941.

*Per Curiam:*

Rehearing denied.