28 So.2d 910

### COMMONWEALTH LIFE INS. CO. v. GEORGE.

6 Div. 468.

Supreme Court of Alabama.

Jan. 16, 1947.

Rehearing Denied Feb. 13, 1947.

Ross, Ross & Ross, of Bessemer, for appellee.

Huey, Welch & Stone, of Bessemer, and Benners, Burr, Stokely & McKamy, of Birmingham, for appellant.

GARDNER, Chief Justice.

This suit is upon a life insurance policy insuring the life of Albert George, with the plaintiff Rosie George, his aunt, named as beneficiary. The policy was issued February 16, 1938, and Albert George, the insured, died on the 22d day of February, 1945.

Ben George, the father of Albert, died as the result of an accident in June, 1933, leaving several children, four girls and four boys, one named Michael being the oldest of the boys, approximately 18 months older than Albert; Albert being the second child, and the other children younger. Albert's mother had died previous to the death of his father.

651

There is some confusion in the record as to the exact location of the residence of Rosie George at the time of his death, but we notice that Rosie George states that her home is 2530 Fifth Avenue, Bessemer, where she has lived all her life; and that Ben George, who was her brother, lived at 510—26th Street, Bessemer, which is quite near and just back of the store.

The father died as result of an accident, and the evidence is to the effect that there was some compensation due these children by a court order. No details appear, but we are informed by the briefs that this was under the Workmen's Compensation statute. At any rate, this necessitated the appointment of a legal guardian. In June, 1933, Kathleen George, another aunt of Albert and a sister of Rosie, the plaintiff in this cause, was duly appointed guardian for all the children, including Albert, by the Probate Court of Jefferson County.

Henry George was a brother of Ben, and he testifies that just after the death of his brother, upon the advice of the doctors, he attempted to get Albert committed to the Partlow State School for Mental Deficients located at Tuscaloosa, Alabama. Henry admitted his signature to the petition for the commitment of Albert to the Partlow State School. And, indeed, the record discloses that Albert was, in fact, stationed at the school a short time before the actual commitment papers were issued. But upon the record proper his admission to the Partlow State School was March 29, 1934, where he remained continually until his death on February 22, 1945.

The medical expert at the Partlow State School (Dr. R. C. Partlow) testified concerning the physical and mental condition of this unfortunate child, of whom he had had personal observation only since 1944. In his opinion Albert George was an idiot, which, according to his view, is a type of mental deficiency of the lowest order. That he had to be force-fed, and was unable to look after his simplest wants, and was constantly under some one's care. This expert was further of the opinion that the term idiot as applied to Albert meant that his mind did not develop from infancy, and that his condition had existed since

birth. He further testified: "Albert George was about the most abnormal person I have ever seen; his head was very much scarred as result of striking himself forcibly on the floor, and different places on his body. He would strike himself on the floor and scar himself more so than some idiots." Dr. Partlow further stated that Albert could not walk except to hop and jump in an extremely abnormal fashion; the attendants having to pick him up and take him from place to place, and that he could neither talk nor hear.

Witness Smitherman had been connected with the Partlow State School as assistant supervisor since July, 1937, and had observed Albert from that time until the time of his death in February, 1945. He stated that the boy was as helpless as an infant, and required the constant attention of some one; that he was of unsound mind. The chart of the School disclosed Albert's admission in March, 1934, and at that time he weighed only 29 pounds, but that his weight and height varied. It further showed that he was a low grade idiot and unable to co-operate in any mental test; that he continually fought himself, displaying much temper, and at times was quite a problem. That he had to be force-fed and that, indeed, he was a nursing problem.

Plaintiff's testimony was contradictory in some respects, particularly to the effect that Albert was an idiot from birth. The plaintiff, Henry George, the uncle of Albert, and Dr. Wright, the physician, testified that he appeared to be a normal child up to the age of 4, 5 or 6 years, at which time he had some sort of stroke resulting in the condition indicated by the testimony of the defendant. Henry George insisted that the boy weighed as much as 60 pounds when he was committed to the Partlow State School, and that in his opinion he had a sound mind. The plaintiff also testified that in her opinion he was of sound mind. The only one who appears to have visited Albert during his stay at the Partlow State School was Henry, who claims that during these years he might have visited him 8 or 10 times. It was he who carried Albert to the institution. At that time Albert was about 13 years of age. Henry insisted

that about a month after Albert had been committed to the Partlow State School he visited him and he appeared healthy, looked much better and wanted to go home with him. He went back to see him again, and stated that he seemed to like the place, though he did not like it at first. That on other visits he had said something about coming home with him, and his recognition was, to use the language of the witness, "He would say—shake his head, and run to the nurse, and go back to the other children."

Giving full weight to the testimony of Henry George, and considering the fact this policy was issued in 1938, it is difficult to see that there is really any conflict produced on consideration of these few visits at the Partlow State School and the testimony of the assistant supervisor, who had constant supervision over Albert from 1937 until the time of his death, as well as the testimony of the mental expert, Dr. Partlow, who had personal contact with him from 1944 until the time of his death, as well as a study of the history of the case from the school chart.

Albert was committed to the institution as an indigent, and remained there during the years at the expense of the State.

Whatever may be said concerning his mental condition at the time of his birth, yet undisputedly from the time of his commitment to the Partlow State School in 1934 to the time of his death Albert was wholly mentally irresponsible.

Plaintiff's testimony is to the effect that at the time of the issuance of this policy, one Hartley, defendant's agent, solicited the insurance on the life of Albert, though she told him that he was at the Partlow State School, was a cripple and paralyzed. She insists that she knew he was not insurable, particularly in view of the fact that he was at the Partlow State School. We have previously observed the testimony of Henry George that he was so committed upon the advice of doctors. Notwithstanding this information on the part of the agent, plaintiff insists that he urged the writing of the insurance and that she signed the name of Albert George to the application for the insurance at the sugges-tion of the agent. The agent insists that on the contrary there was exhibited to him a boy about the age and height and weight of the one specified in the application, and that it was this Albert George whose life was being insured. Hartley further testified that he remembers something about plaintiff's reference to a school, but that he knew nothing about the school and considered it immaterial what school he was attending.

The defendant lays stress upon several lines of defense. First, it is urged that by virtue of Title 9, § 43, Code of 1940, the contract of insurance is void because of the mental incapacity of Albert George to enter into a contract of insurance. Further, that if there was a substitution or impersonation by a third person for the insured, there was no contract of insurance, citing National Life & Accident Ins. Co. v. Alexander, 226 Ala. 325, 147 So. 173; National Life & Accident Ins. Co. v. Moore, 216 Ala. 554, 114 So. 45; 29 Am. Jur., page 681, and authorities cited in the note.

These and other matters are argued in brief, all of which present questions worthy of serious consideration, but which we lay aside as unnecessary for consideration here in view of the conclusion reached that the plaintiff has failed to show that she had an insurable interest in the life of Albert George. That is the fundamental question in the case, and upon which we think the decision here is properly to be rested.

■ It is, of course, well established that one cannot take out a valid and enforcible policy of insurance for his own benefit on the life of a person in which he has no insurable interest. Such a policy or contract of insurance is void and unenforcible on ground of public policy, it being merely a wagering contract. The decisions are also to the effect that such a policy is void at its inception and is not rendered valid by a clause declaring it incontestable after a specified period of time. The reasoning found in the cases is based upon the presumption that a temptation would be held out to the one taking out the policy to hasten by improper means the time when he should receive the amount

of insurance named in the policy. Good faith alone will not suffice to sustain a policy taken out on the life of another by one who has no interest in the continuance of such life. If good faith alone would sustain the contract then the law which condemns such transaction upon the ground of public policy would, as observed by the Virginia court in Crismond's Adm'x v. Jones, 117 Va. 34, 83 S.E. 1045, Ann.Cas. 1917C, 155, avail but little. 37 C.J. pages 385, 386. And, by the decided weight of authority, the relationship between uncle or aunt and nephew or niece is not in itself sufficient to support a policy taken by one on the life of the other. 37 C.J. page 394. That such was the well settled rule of law was recognized by this court in National Life & Accident Ins. Co. v. Alexander, supra.

In Volume 1 of Cooley's Briefs on Insurance, Second Edition, page 385, under the text statement that "The relationship of uncle or aunt and nephew or niece will not support an insurable interest," are cited a large number of decisions from various jurisdictions. And, indeed, our search thus far has disclosed no authority holding to a contrary view.

■ The observation of the court in Warnock v. Davis, 104 U.S. 775, 26 L.Ed. 924, in regard to what is an insurable interest has been often cited by text books and by decisions generally. There it was recognized that it was not easy to define with precision what in all cases would constitute an insurable interest so as to take the contract out of the class of wager policies. In a helpful note to the case of Young v. Hipple, 25 A.L.R. 1541, the author has succinctly stated the rule as observed in the Warnock case, which is here worthy of repetition. "As there is much conflict among the authorities on the general question as to what constitutes an insurable interest, it may be helpful at the outset to bear in mind the statement of the Federal Supreme Court on this question, to the effect that it is not necessary that the expectation of advantage or benefit should be always capable of pecuniary estimation, for a parent has an insurable interest in the life of his child, and a child in the life of his parent, as does also a husband in the

life of his wife, and a wife in the life of her husband; that the natural affection in cases of this kind is considered as more powerful, as operating more efficaciously, to protect the life of the insured than any other consideration; but that in all cases there must be a reasonable ground, founded upon the relations of the parties to each other, either pecuniary or of blood or affinity, to expect some benefit or advantage from the continuance of the life of the insured, or otherwise the contract is a mere wager by which the party taking the policy is directly interested in the early death of the insured."

The note also reviews other authorities, some of which hold, as in Thomas v. National Benefit Ass'n, 84 N.J.L. 281, 86 A. 375, 46 L.R.A.,N.S., 779, Ann.Cas.1914D, 1121, to the effect that it is not necessary in order to create such an interest that the insured shall be in any legal obligation, either financial or otherwise, to the beneficiary, but that if the insured be under moral obligation to render care and assistance to the beneficiary in the time of the latter's need, then the latter has an insurable interest other than a mere pecuniary one in the life of the former. That case involved the adoption, from a practical standpoint, of a girl from an orphan institution and giving her a home under circumstances calculated to raise reasonable expectations to care for her during the declining years of the benefactress. It was, as we view it, a case in which the beneficiary named in the policy stood in loco parentis to the insured. In Helmetag's Adm'r v. Miller, 76 Ala. 183, 52 Am.Rep. 316, in the opinion, discussing the question of insurable interest, was the observation: "There is no limit to the insurable interest which a man may have in his own life; but there are forcible reasons why a mere stranger should not be permitted to speculate upon the life of one whose continued existence would bring to him no expectation of possible benefit or advantage. * * *. The reason of the law which vitiates wager policies, is the pecuniary interest which the holder has in procuring the death of the subject of insurance, thus opening a wide door by which a constant temptation is created to commit for profit

the most atrocious of crimes." See also Alabama Cold Life Ins. Co. v. Mobile Mutual Ins. Co., 81 Ala. 329, 1 So. 561. Even in those cases where the beneficiary stands in loco parentis it may be shown that the relationship was severed at the time the insurance was acquired. Such is the holding of the Pennsylvania court in Young v. Hipple, supra. As pointed out in the Warnock case above cited, a parent has an insurable interest in the child, and the child in the life of its parent, and a husband in the life of his wife, and the wife in the life of her husband. Such relationship suffices for all purposes of insurable interest for the reason that the natural affection in cases of this kind is considered more powerful and operating more efficaciously to protect the life of the insured than any other consideration. But, as observed in that authority, in all cases there must be a reasonable ground founded upon the relationship of the parties to each other, either pecuniary or of blood or affinity to expect some benefit or advantage from the continuance of the life of the insured. Otherwise, the contract is a mere wager by which the party taking the policy is directly interested in the early death of the insured. There are numerous cases to like effect in various jurisdictions. Those illustrating the principle here, and which are of interest, are Home Mut. Ben. Ass'n v. Keller, 148 Ark. 361, 230 S.W. 10; Dresen v. Metropolitan Life Ins. Co., 195 Ill.App. 292; American Mut. Life Ins. Co. v. Bertram, 163 Ind. 51, 70 N.E. 258, 64 L.R.A. 935; Cronin v. Vermont Life Ins. Co., 20 R.I. 570, 40 A. 497.

In the instant case Albert George had a legal guardian in the person of Kathleen, his aunt, who, as we previously observed, was appointed guardian in June, 1933. Kathleen died in November, 1944. As has been stated, Albert's father died in June, 1933. Plaintiff, Rosie George, stated that she had had the care and upbringing of the children of Ben George since his death, including Albert up to the time that he was carried to the Partlow State School. But at that time his aunt Kathleen George was his legally appointed guardian and presumably remained so until the time of her death in November, 1944. And according to the record within a year after the death of the father Albert was committed to the Partlow State School, and remained a ward of the State until his death from pneumonia in 1945. Plaintiff further testified, however, that Kathleen lived in the same house with Albert until she married. Her marriage occurring some 10 years before the trial, which, therefore, must have taken place in 1936, as the trial was in 1946, and Albert committed to the Partlow State School in 1934. And she further states that she, Kathleen and the children were all living together. Plaintiff had previously stated that Kathleen had the custody and control of Albert, and that she looked after him. But all of this then was evidently during the lifetime of the father, Ben George, who died, according to the testimony, in 1933.

Viewed, however, in any aspect the plaintiff failed to show she stood in loco parentis to Albert George at any time. Even if such relationship had been shown it was clearly severed when the boy was turned over to the Partlow State School as a ward of the State. Nor could the plaintiff in any event have had any reasonable ground founded upon the relation of her as aunt to Albert, her nephew, to expect any benefit or advantage from the continuance of his life. Undisputedly, he was an unfortunate, hopelessly irresponsible cripple, incapable of understanding in any manner any question of legal or moral obligation. Though the plaintiff may have been entirely innocent, and, indeed, she insists she informed the agent as to his paralytic condition, and the institution in which he was placed, yet, from the legal standpoint of interest his early demise would be to her advantage. Hopelessly afflicted as he was, she could not have been interested in the continuance of his life.

The case comes, in our opinion, well within the recognized principle that no insurable interest was shown, and that the affirmative charge requested by the defendand was due to be given.

Counsel for plaintiff seek to invoke as against any defense to this policy the incontestable clause contained therein. But the decided weight of authority, and sound

reasoning as well, support the view that the incontestable clause furnishes no answer to the defense that the plaintiff was without insurable interest. This, upon the theory the policy of insurance was void as against public policy. As stated in the text of Volume 1, Couch's Cyclopedia of Insurance Law, page 770: "The parties to a contract of insurance cannot, even by solemn agreement, override the public policy which requires the beneficiary to have an insurable interest."

The authorities hold that the insurance company cannot be held to a contract of insurance on the principle of a wager where it could not make such a contract in the first instant. In 29 Am.Jur. page 680, it is observed in the text: "An insurance policy which is invalid as being violative of public policy or good morals cannot be validated by the agreement of the parties that it shall be incontestable after a stated time." To like effect see 44 C.J.S., Insurance, § 200, p. 896.

The Kentucky case of Bromley v. Washington L. Ins. Co., 122 Ky. 402, 92 S.W. 17, 5 L.R.A., N.S., page 747, 121 Am.St.Rep. 467, 12 Ann.Cas. 685, contains an interesting discussion, with a valuable quotation from an early case from the United States Supreme Court. The holding in the Kentucky case was to the effect that if the contract is against public policy the court will not lend its aid to its enforcement; that the parties to an illegal contract cannot by stipulating that it shall be incontestable, tie the hands of the court and compel it to enforce contracts which are illegal and void, and that if this were allowed then the law might be evaded in all cases and the aid of the court might be secured in aid of its infraction. The quotation which we think worthy of repetition here is from the case of Coppell v. Hall, 7 Wall. 542, 559, 19 L.Ed. 244, 248, and is as follows:

"The defense is allowed, not for the sake of the defendant, but of the law itself. The principle is indispensable to the purity of its administration. It will not enforce what it has forbidden and denounced. The maxim, ex dolo malo non oritur actio, is limited by no such qualification. The proposition to the contrary strikes us as hardly worthy of serious refutation. Whenever the illegality appears, whether the evidence comes from one side or the other, the disclosure is fatal to the case. No consent of the defendant can neutralize its effect. A stipulation in the most solemn form to waive the objection would be tainted with the vice of the original contract, and void for the same reasons. Wherever the contamination reaches, it destroys. The principle to be extracted from all the cases is, that the law will not lend its support to a claim founded upon its violation."

True, there may be found some authority to the contrary, as pointed out in 29 Am. Jur. page 681, but the case cited in the note clearly indicates that the ruling involved was largely one of fraudulent representation, and that the pivotal question was not that here presented. But however that may be, we find ourselves in accord with the decided weight of authority, as indicated by the foregoing citations.

The holding in Mutual Life Ins. Co. v. Lovejoy, 201 Ala. 337, 78 So. 299, L.R.A. 1918D, 860, we may add, is in no manner in conflict with the conclusion here reached. The instant case is differentiated upon the theory that here there was in fact no contract, it is void in its inception and, therefore, never became effective. Indeed, some of the reasoning in the opinion of the majority, as written by Justice Mayfield, in the Lovejoy case indicates very clearly that had the contract been one which was void at its inception the incontestable clause would have presented no answer to such a defense.

This observation is likewise applicable to Supreme Lodge K. P. v. Overton, 203 Ala. 193, 82 So. 443, 444, 16 A.L.R. 649. The opinion in that case was written by Justice Mayfield, and the following language illustrates the point of differentiation here noted. This language is as follows: "If a plea should allege that there was no contract of insurance because it was void in its inception, being against public policy, as an attempt to violate or evade the law, then a different question would be presented that would attack the incontestable clause as well as all other provisions of the policy. The effect of such a plea would be to show there was never any contract of insurance."

The Lovejoy and Overton cases, noted above, were differentiated in Protective Life Ins. Co. v. Linson, 245 Ala. 493, 17 So.2d 761, where the incontestable clause was invoked as an answer to the defense that the beneficiary had murdered the insured. The ruling was that no incontestable clause can invest the beneficiary who has feloniously slain the insured with the right to recover the death benefit by any stipulation closing the door to such defense, or otherwise.

As we have previously observed, the basic requirement that the beneficiary should have an insurable interest in the life of the insured is rested upon a like principle of public policy, which would remove from the beneficiary any temptation to so atrocious a crime.

. We, therefore, conclude that the incontestable clause furnishes no answer to the defense here treated.

There was tendered and paid into court for the plaintiff all the premiums which she had paid on the policy with interest thereon, and this in our opinion was the extent of any claim she could rightfully assert against this defendant.

For the error indicated, let the judgment stand reversed.

Reversed and remanded.

FOSTER, LAWSON and STAKELY, JJ., concur.