100 So.2d 696

**LIBERTY NATIONAL LIFE INSURANCE COMPANY et al.**

v.

Gaston WELDON.

5 Div. 605.

Supreme Court of Alabama.

Nov. 14, 1957.

Rehearing Denied March 6, 1958.

Spain, Gillon & Young, Ralph B. Tate and Frank M. Young, Birmingham, and Reneau & Reneau, Wetumpka, for Liberty Nat. Life. Ins. Co.

Walter M. Robinson, Jr., Nashville, Tenn., Jas. A. Simpson, Chas. B. Robinson and Lange, Simpson, Robinson & Somerville, Birmingham, and Robt. S. Milner and Holley, Milner & Holley, Wetumpka, for National Life & Acc. Ins. Co.

T. B. Hill, Jr., Montgomery, W. H. Sadler, Jr., Birmingham, and Edwin Sanford, Wetumpka, for Southern Life & Health Ins. Co.

Godbold & Hobbs and Truman Hobbs,
Montgomery, for appellee.

LAWSON, Justice.

This is a suit by Gaston Weldon, who sues as the father of Shirley Dianne Weldon, deceased, his minor daughter, under § 119, Title 7, Code 1940, the so-called homicide statute, against Liberty National Life Insurance Company, a corporation; National Life & Accident Insurance Company, a corporation; and Southern Life & Health Insurance Company, a corporation.

We will sometimes hereafter refer to Gaston Weldon as the plaintiff, to his deceased child as Shirley, and to the defendant insurance companies as Liberty National, National Life and Southern Life.

Shirley died on May 1, 1952, when she was approximately two and one-half years of age. Prior to her death each of the defendant insurance companies had issued a policy wherein Shirley's life was insured. The policy of Liberty National in the amount of $500 was issued on December 1, 1951. National Life's policy in the amount of $1,000 was issued on or about April 23, 1952. The policy of Southern Life in the amount of $5,000 was issued in the latter part of March, 1952. Each of those policies was issued on an application of Mrs. Earle Dennison, who was an aunt-in-law of Shirley, that is, she was the widow of a brother of Shirley's mother. Each of the policies provided that the death benefits be paid to Mrs. Dennison. The Southern Life policy did contain a provision to the effect that Shirley's mother was a contingent beneficiary. The Liberty National policy was delivered to Mrs. Dennison on or about the day of its issue. The policy issued by National Life had not been delivered to Mrs. Dennison at the time of Shirley's death. At that time it was in the possession of the local agent to whom it had been sent by the home office in Nashville, Tennessee. The policy of Southern Life was delivered to Mrs. Dennison during the latter part of March, 1952.

The theory on which plaintiff seeks to recover damages from the defendants is that Mrs. Dennison had no insurable interest in Shirley's life and that the defendants knew or should have known that fact; and, that by reason of the wrongful and negligent issuance of the "illegal" policies of insurance Mrs. Dennison murdered Shirley with the hope of collecting the insurance proceeds.

The case was submitted to the jury on plaintiff's amended complaint which consisted of six counts, in each of which damages were claimed in the amount of $100,-000. Counts 1 and 2 charge the defendants with wrongful acts in issuing policies of insurance in which the applicant-beneficiary had no insurable interest in the life of the insured, with Count 1 charging knowledge of the want of insurable interest on the part of the defendants, and Count 2 alleging knowledge or that by the exercise of reasonable diligence the defendants should have known that there was a lack of insurable interest. Counts 3 to 6 inclusive are grounded on negligent acts on the part of the defendants, with Counts 3 and 6 alleging that the acts of the defendants placed the insured child in a zone of danger, with unreasonable risk of harm to her and that the defendants in issuing the alleged illegal contracts of insurance knew, or by the exercise of reasonable diligence should have known, that the beneficiary, Mrs. Dennison, had no insurable interest in the life of the insured. Count 4 alleges a negligent act. Count 5 alleges a negligent act and pleads facts going to show a lack of insurable interest in Mrs. Dennison, the beneficiary. Each of the counts contains an averment to the effect that the wrongful or negligent acts of the defendant insurance companies concurred or united in proximately contributing to or causing the death of plaintiff's minor child.

To the complaint as last amended and to each of its counts the defendants separately demurred. The demurrers were overruled. The defendants' motions for change of venue were denied. The defendants separately plead the general issue in short by consent in the usual form. There were verdict and judgment for the plaintiff in the amount of $75,000. The motions for new trial filed by each of the defendant insurance companies having been overruled, each of them has appealed to this court.

We have given to the thousand-page record in this case and to the extensive briefs of counsel for the parties the laborious examination which a case of first impression deserves. We proceed to state, as briefly as we can, the conclusions we have attained in regard to the several assignments of error which are insisted upon in the brief filed here on behalf of the appel-

lants. We will consider first those assignments of error which are relied upon by all of the appellants, the defendants below.

■■■ Assignment of Error No. 1 of each appellant is: "1. The Court erred in overruling this defendant's demurrer to the complaint as last amended." This assignment is not too general. Vinson v. Vinson, 256 Ala. 259, 54 So.2d 509. It is not necessary to make a separate assignment of error as to each ground of demurrer relied upon. Brewer v. Brewer, 259 Ala. 149, 66 So.2d 450, and cases there cited. But under such assignments we generally treat only those grounds of the demurrer insisted upon in brief of appellant as having been well taken. Groover v. Darden, 259 Ala. 607, 68 So.2d 28, and cases cited; Southern Ry. Co. v. Sanford, 262 Ala. 5, 76 So.2d 164. No ground of any of the demurrers is referred to by number in the brief of appellants nor is any ground quoted or paraphrased. The argument made by appellants in support of their Assignment of Error No. 1 indicates that they contend that ground 33 of the demurrer filed by each of them was well taken and hence the trial court erred in not sustaining their demurrers. A demurrer, of course, is a single entity and if any ground is good the demurrer should be sustained. Opelika Montgomery Fair Co. v. Wright, 255 Ala. 499, 52 So.2d 412. Ground 33 of the demurrer filed separately by each defendant reads: "For that it affirmatively appears that said policies of insurance on the life of the said Shirley Dianne Weldon were void and worthless and hence could in fact constitute no inducement to kill said child."

Each of the counts in the complaint as last amended contained language substantially as follows: " * * * that said policies of insurance issued by the defendant insurance companies were illegal contracts for the reason that they tended to induce the beneficiary to bring about the death of the insured, the said Shirley Dianne Weldon, and said contracts did in fact so induce said beneficiary who thereafter in the hope of collecting the fruits of such wrongful contracts killed said minor child on, to-wit," etc.

If we understand the argument of appellants, it is that Mrs. Dennison is presumed to have known the law, that is, that the contracts of insurance were illegal and void, and hence those contracts could not have served as an inducement to kill.

In support of their argument appellants rely upon Gooch v. State, 249 Ala. 477, 31 So.2d 776, 174 A.L.R. 1297, a criminal case concerned with the elements necessary to constitute the crime of forgery wherein we held, in part: "So, a check given on Sunday, unless for one of the purposes permitted by law as set forth in the Sunday statute [§ 21, Title 9, Code 1940], would be void and not the subject of forgery." 249 Ala. 479, 31 So.2d 779.

We do not think the holding in the Gooch Case is in any way controlling here. We cannot lift out of context the criminal law rationale of that case and apply it to this case, where the averments of the complaint are clearly to the effect that Mrs. Dennison killed because she thought the policies were valid and that she would be paid the death benefits. In Dennison v. State, 259 Ala. 424, 66 So.2d 552, 554, we affirmed the conviction of Mrs. Dennison of murder in the first degree. In the opinion there written, after referring to two of the insurance policies here involved, we said: "If, therefore, it were necessary to search for a motive we would find it here." See Black v. State, 137 Tex.Cr.R. 173, 128 S.W.2d 406.

The appellants, defendants below, in support of their argument that ground 33 of their demurrers was well taken, cite and quote from the case of Peckham v. Grindlay, 1885, 17 Abb.N.C., N.Y., 18 wherein it was held that a complaint by a brother to cancel an insurance policy wherein his sister was named as beneficiary was demurrable. The demurrer admitted the averments of the complaint to the effect that the sister had no insurable interest in her brother's life. But the New York court held that the complaint did not state a

case for cancellation for two reasons. First, the plaintiff was estopped. The policy had been issued and accepted with his consent and premiums paid thereon for over twenty-three years. Second, the complaint contained no averments to the effect that plaintiff was in danger at the hands of his sister. Plaintiff's counsel took the position that the policy was void. The New York court observed that if void there was no occasion for a judgment directing the surrender and cancellation of the policy.

The complaint in the instant case shows no basis for the application of the doctrine of estoppel but it does show that the insured's life was in danger at the hands of the beneficiary. We are of the opinion that the averments of the bill in the Peckham Case, supra, present an entirely different situation from that presently before us and that the holding in that case is not here in point.

Ground 33, supra, is the only ground of the demurrer which is adequately argued in brief filed here on behalf of the appellants. The last paragraph of the argument in support of Assignment of Error No. 1 reads: "In addition to the foregoing, appellants are of the opinion that their several demurrers to the complaint as last amended should have been sustained for the additional reasons assigned elsewhere in this brief in support of assignment of error No. 24. They adopt said argument herein elsewhere assigned in support of assignment of error No. 24 as additional argument in support of this assignment of error." Assignment of Error No. 24 relates to the refusal of the general affirmative charge requested by the defendants and the argument made in support of that assignment is directed to alleged failure of proof, not of allegation. No ground of demurrer is referred to in that argument and we do not feel called upon to analyze that argument in an attempt to find some part or parts of it which might be said to show that one or more of the innumerable grounds of the demurrers were well taken.

There being no merit in the ground of the demurrers which we understand the appellants to have argued in brief filed here, we hold that error in overruling the demurrers is not made to appear.

Assignment of Error No. 8 of each appellant challenges the action of the trial court in overruling their motions for change of venue. In support of those motions, wherein they averred in effect that they could not get a fair and impartial trial in Elmore County, the defendants relied in the main on a newspaper story concerning this suit which appeared in the October 22, 1953, issue of the Wetumpka *Herald*, a newspaper widely circulated in Elmore County. The newspaper story pointed out the theory on which the plaintiff sought to recover damages from the defendants, the amount of damages claimed, the ruling of the trial court on the demurrers, the date the case was set for trial, and the fact that it involved questions of considerable interest to the legal profession and to the insurance business. The story also called attention to the fact, already known by most people in Alabama, that Mrs. Dennison had been electrocuted for the murder of Shirley and that she was the first white woman to be electrocuted for crime in Alabama. The newspaper account was concluded with these words in parentheses: "Not the $64,000 question but the $100,000 question."

The matter of granting change of venue is addressed to the sound discretion of the trial court. Littlefield v. State, 36 Ala.App. 507, 63 So.2d 565, certiorari denied, 258 Ala. 532, 63 So.2d 573; Ex parte Morrow, 259 Ala. 250, 66 So.2d 130. Newspaper publicity does not necessarily constitute grounds for a change of venue. Littlefield v. State, supra. We see nothing in the newspaper account which would justify us in holding that the trial court abused its discretion in denying the motions for change of venue. Nor could we put the trial court in error on the mere statement of counsel for the defendants below that the defendants could not get a

fair trial in Elmore County because the people of that county were aroused over the fact that Mrs. Dennison had murdered Shirley.

We hold that no error resulted from the trial court's rulings on the motions for a change of venue, even if properly presented, which is not questioned by appellee, but see Kansas City, M. & B. R. Co. v. Sanders, 98 Ala. 293, 13 So. 57.

■ Assignment of Error 24 of each appellant reads: "24. The Court erred in failing and refusing to give to the jury, at the request of this defendant, the following written charge: '15. I charge you that if you believe the evidence in this case you cannot find for the plaintiff.' " In considering this assignment we review the evidence in the light most favorable to the plaintiff, for when an affirmative instruction is refused and the party who requested the charge appeals, the entire evidence is viewed in the light most favorable to the opposite party and where reasonable inferences may be drawn adverse to the party who requested the charge, the action of trial court in refusing the charge must be affirmed. Aircraft Sales & Service v. Gantt, 255 Ala. 508, 52 So.2d 388; Hasty v. Hasty, 260 Ala. 90, 69 So.2d 282; Adams v. Queen Insurance Co. of America, 264 Ala. 572, 88 So.2d 331.

The evidence in this case shows beyond peradventure that Shirley was murdered by Mrs. Dennison. We will briefly summarize the facts which tend to support that statement. In the early afternoon of May 1, 1952, Mrs. Dennison drove to plaintiff's home, in rural Elmore County, where she found the plaintiff, his wife and their two children, Orville and Shirley. Shortly after Mrs. Dennison's arrival the plaintiff and his son left the home to attend to some duties around the farm. At the time of their return home Mrs. Dennison was engaged in serving some soft drinks which she had purchased at a nearby store. Mrs. Dennison divided an orange drink between Orville and Shirley. Shirley's drink was poured into a little cup that Mrs.

Dennison provided. Shortly after she consumed her drink Shirley became very nauseated. After the nausea subsided Mrs. Dennison left the room but returned in a short time shaking a partially filled bottle of Coca-Cola, from which she gave Shirley a drink. Shirley again became violently nauseated and that condition continued until she became almost unconscious. At the mother's insistence Shirley was taken to Wetumpka in search of a doctor. She was admitted to a hospital in Wetumpka shortly after her arrival there. She died within a comparatively short time after she was admitted to the hospital.

Dr. Rehling, the Director of the Department of Toxicology of this state, testified that an autopsy which he performed revealed arsenic in fatal quantities in Shirley's body and expressed the opinion that the child died as the result of arsenic taken through her mouth. He testified that he found traces of arsenic on articles of clothing worn by Shirley and by Mrs. Dennison at the time the drinks were served and he further testified that he found traces of arsenic in the cup from which Shirley drank. The appellants do not contend here that the evidence was not altogether ample to support a jury finding that Mrs. Dennison murdered the little girl.

The evidence is also clear to the effect that Mrs. Dennison murdered the child in order to collect insurance benefits payable to her upon the child's death. We will not undertake to set out all of the evidence which tends to support that statement, for the defendants do not contend that such was not the case. We simply call attention to one incident which we think clearly shows why Mrs. Dennison poisoned the child. Mrs. Dennison was a nurse in the hospital to which Shirley was admitted and she was directed by the doctor in charge of Shirley to administer aid to the patient. By late afternoon when it was apparent that Shirley was dying, Mrs. Dennison left the hospital and drove approximately twelve miles to the home of an insurance agent to pay the premium

on the Liberty National policy which was about to lapse.

So it is clear that the harm which came to plaintiff's little girl was not caused by the direct act of any of the defendants, but by the intervening act of Mrs. Dennison, who has paid with her life for her horrible crime.

But as before indicated, the plaintiff says, in effect, that such harm would not have come to his little girl if the defendants had not wrongfully or negligently issued to Mrs. Dennison the alleged illegal policies covering Shirley's life.

The plaintiff has proceeded against these defendants on the theory that Mrs. Dennison did not have an insurable interest in the life of Shirley and hence the policies involved were illegal and void as against public policy; that the defendants were negligent in the issuance of the policies in that they knew there was no such interest or failed to exercise reasonable diligence to ascertain that fact before issuing the policies, although there was a duty upon them to do so; and that the failure to perform that duty was in fact the proximate cause of the child's death.

The evidence was sufficient to show a lack of insurable interest. In the brief filed here on behalf of appellants reference is made to the case of National Life & Accident Ins. Co. v. Davis, 179 Ark. 621, 17 S.W.2d 312, which holds, in effect, that the relationship of aunt and niece, standing alone, is sufficient to provide an insurable interest. But such is not the law of this state. We have held to the contrary. Commonwealth Life Ins. Co. v. George, 248 Ala. 649, 28 So.2d 910, 170 A.L.R. 1032, and authorities cited. Our holding is in accord with that of most of the courts in this country. See Cooley's Briefs on Insurance (Second Ed.), Vol. 1, p. 385. Moreover, Mrs. Dennison was not an aunt of Shirley but an aunt-in-law and the courts seem to be in accord in holding that an in-law relationship in and of itself does not sustain an insurable interest. National

Life & Accident Ins. Co. v. Middlebrooks, 27 Ala.App. 247, 170 So. 84; National Life & Accident Ins. Co. v. Ball, 157 Miss. 163, 127 So. 268; Cooley's Briefs on Insurance (Second Ed.), Vol. 1, pp. 386, 387.

■ Most certainly the evidence in this case does not show as a matter of law that Mrs. Dennison had an insurable interest in Shirley because she had a reasonable expectation of possible profit or advantage to her from the continued life of Shirley. Helmetag's Adm'r v. Miller, 76 Ala. 183; Commonwealth Life Ins. Co. v. George, supra. Mrs. Dennison did not provide a home for Shirley. They lived in different towns several miles apart. Shirley lived in the home of her parents with her brother and sister and received her entire support from her parents. She saw Mrs. Dennison only when the latter made her infrequent visits to the home of Shirley's parents. Shirley had spent only one night under a roof with Mrs. Dennison and that was on an occasion when her entire family spent the night in the Dennison home and that visit was made while Mr. Dennison, the brother of Shirley's mother, was living. Mrs. Dennison had given Shirley a few presents but they were of very little value.

■ Since the jury was authorized under the evidence to find that Mrs. Dennison had no insurable interest in the life of Shirley, a finding that the policies of insurance were illegal and void as repugnant to public policy naturally followed.

In 1884 in the case of Helmetag's Adm'r v. Miller, supra, Mr. Justice Somerville, writing for the court, said in part as follows:

"No principle of the law of life-insurance is at this day better settled, than the doctrine, that a policy taken out by one person upon the life of another, in which he has no insurable interest, is illegal and void, as repugnant to public policy. 3 Kent's Com. (11th Ed.) 462–63. Such contracts are aptly termed 'wager policies,' and are entitled to no higher dignity, in the

eye of the law, than gambling speculations, or idle bets as to the probable duration of human life. There is no limit as to the insurable interest which a man may have in his own life; *but there are forcible reasons why a mere stranger should not be permitted to speculate upon the life of one whose continued existence would bring to him no expectation of possible profit or advantage.* All wagers, at common law, were not illegal, but only such as were contrary to good morals or sound policy. Chitty, Contr. 468. The statutes of this State make all contracts by way of gaming or wagering void. Code, 1876, § 2131; Hawley v. Bibb, 69 Ala. 52. However this may be, wager policies, *or such as are procured by a person who has no interest in the subject of insurance, are undoubtedly most pernicious in their tendencies, because in the nature of premiums upon the clandestine taking of human life.* * * *

"* * * *The reason of the law which vitiates wager policies is the pecuniary interest which the holder has in procuring the death of the subject of insurance, thus opening a wide door by which a constant temptation is created to commit for profit the most atrocious of crimes.* * * *"* (Emphasis supplied.) 76 Ala. 186–187.

The holding in the Helmetag case, supra, has been consistently followed by this court. National Life & Accident Ins. Co. of Nashville, Tenn. v. Alexander, 226 Ala. 325, 147 So. 173, and cases cited; Commonwealth Life Ins. Co. v. George, supra. That holding is in accord with that of a vast majority of the courts of other jurisdictions. See Cooley's Briefs on Insurance (Second Ed.), Vol. 1, p. 330; Richards on Insurance (Fifth Ed.), Vol. 1, § 92, p. 381; 44 C.J.S. Insurance § 200; 29 Am. Jur., § 318.

From the evidence presented the jury was well justified in finding that none of the defendants before issuing the policies

of insurance made reasonable effort to ascertain whether Mrs. Dennison did in fact have an insurable interest in Shirley's life.

■ Mrs. Dennison apparently stated to the agents of each of the defendant insurance companies that she was Shirley's aunt because that relationship is shown on each application. But as we have shown, that relationship standing alone was not sufficient to sustain an insurable interest and, in fact, Mrs. Dennison was only an aunt-in-law.

We will state as briefly as possible the evidence as it relates to the issuance of the insurance policies, which statement, of course, is based on the evidence most favorable to the plaintiff below, the appellee here.

As heretofore shown, the first of the three policies issued on the life of Shirley with which we are presently concerned was that issued by Liberty National. The application was taken by J. M. Stoudemire, who was Liberty National's superintendent in Elmore County. Stoudemire was a lifelong friend of the plaintiff and saw him almost daily, but he never told plaintiff or Mrs. Weldon that the policy had been issued and that policy was in force about five months before Shirley was killed. Cecil Bailey, an agent of Liberty National, delivered the policy to Mrs. Dennison and collected the premiums from her. Bailey admitted that when he delivered the policy to Mrs. Dennison he knew that Shirley was not living with Mrs. Dennison and understood at that time that the child was living with her parents. Bailey read from Liberty National's instruction book as to who are "acceptable beneficiaries" and admitted that nowhere therein was it provided that an aunt or an aunt-in-law was an acceptable beneficiary. The instruction book did not include an aunt or aunt-in-law as an acceptable beneficiary but Bailey testified that Liberty did write policies where aunts are beneficiaries if the insured "was living with the aunt and they were in the same house and good reputable people." Bailey stated that he just did not know if the Liberty

National policy was in violation of his company's rules. Mrs. Dennison later sought to obtain a $5,000 policy on Shirley's life from Liberty National but she was informed by Bailey that such a policy could not be written. Included in Liberty National's book of instructions to its agents was this rule: "Applications on persons under ten years of age must be signed by the parent or guardian in his or her own name and not in the name of the life proposed." Bailey stated, however, that he did not know whether his company required parental consent where a policy was written on a child. Neither parent signed the application for insurance or knew that one had been made by Mrs. Dennison until after the death of their child. As far as we can determine, Liberty National made no effort to determine whether Mrs. Dennison had an insurable interest in Shirley's life. In fact, in answer to interrogatories Liberty National took the position that its agents were not given any instructions concerning any requirement as to insurable interest in the type of policy issued to Mrs. Dennison, contending no such interest was necessary in that type of policy. The latter contention will be dealt with later on in this opinion.

The application for the Southern Life policy was obtained from Mrs. Dennison on January 24, 1952, by Eugene Keener, who had been an agent for that company for fourteen years. Keener met Mrs. Dennison on the day the application was taken at the hospital in Wetumpka where she worked. He had never seen her before, but accepted her application for a $5,000 policy on Shirley's life and accepted from Mrs. Dennison the sum of $8.20 as payment of her first premium. At that time Keener had never seen Shirley or her parents, but later on the same day he drove to the Weldon home in compliance with a rule of his company that he certify to the company that he "has seen the child." When Keener arrived at the Weldon home he saw Shirley and Mrs. Weldon. He told Mrs. Weldon that Mrs. Dennison wanted to take out an educational policy on Shirley. Upon being told by Mrs. Weldon that he would have to see Mr. Weldon about the policy, Keener replied that the policy could not be written until Shirley had been examined by the family doctor. No such examination was ever made and Shirley's parents did not know until after her death that the policy had in fact been issued in March of 1952. Keener forwarded Mrs. Dennison's application to the district office where it was received on January 28, 1952. According to Keener's testimony, only one further act remained to be done and that was for Mrs. Dennison to get a medical certificate stating that Shirley had been examined by a doctor who found her in good health. Keener went to Mrs. Dennison and inquired about the delay. Nearly two months after the application was taken Mrs. Dennison obtained a medical certificate. The certificate was not executed by the family doctor, or even by a doctor connected with the hospital where Mrs. Dennison worked as a nurse. It was executed by a doctor who did not live or work in Wetumpka or in the community where the Weldon family lived. Mrs. Dennison drove to the doctor's office in another town and by false statements and because of prior friendship, although she had not seen him in eight years, persuaded him to sign a medical certificate stating that he had examined the child when, in fact, he had never seen her. Keener knew that Shirley was living with her parents but apparently was not at all concerned about the matter of insurable interest or lack of it. He stated that he had never been given any instructions by his company concerning that subject. When Keener took the application for the policy he told Mrs. Dennison of his company's rule to the effect that before a policy could be written on one child in the family there must be at least the same amount of insurance on every other member of the family. Mrs. Dennison apparently satisfied Keener as to this point by merely telling him that Shirley was the only member of her family whose life was not insured for $5,000 or words to that effect. Keener apparently was not interested in pursuing

the matter further, although as shown above he made a visit to the very humble home in which the Weldons lived. The Southern Life policy is labeled "Juvenile Endowment Policy" although it did not mature until the year 2035, at which time the juvenile would have been more than eighty-five years of age.

The application for the National Life policy was taken in late March or early April by S. M. Oxford, an agent of that company, who had never talked to Mrs. Dennison prior to the day on which the application was obtained. At the time he took the application Oxford knew that Mrs. Dennison, while working in Wetumpka, lived in Holtville and that Shirley lived with her parents in Claud, a community situate several miles from Holtville and Wetumpka. Mrs. Dennison told Oxford that she had no dependants but made no representation that she supported Shirley. In answer to a question as to what insurable interest he found, he replied: "Well, the fact that she wanted an educational policy for her niece and the fact that her parents couldn't afford to pay for it. * * * Well, that coupled with the fact that she said she was always doing something for the child and buying it shoes and things. She just seemed interested in the child and she commented on it highly." Oxford went to the Weldon home a few days after he received the application. The evidence is in direct conflict as to what occurred on that occasion but when viewed in the light most favorable to the plaintiff it shows that Mr. Weldon, the plaintiff, told Oxford he did not want anybody taking out insurance on his children and that if he needed any insurance he would contact Oxford. The evidence for the plaintiff is to the effect that neither he nor his wife had any knowledge of the fact that the policy had been issued.

▮ We repeat what we said above to the effect that the jury could well find from the evidence presented that none of the insurance companies were concerned about the matter of insurable interest and

did not undertake to exercise reasonable care not to issue a policy to a beneficiary without insurable interest.

▮ The conclusions which we have reached above, namely, that the evidence was sufficient to show that Shirley was murdered and the policies were void because of lack of insurable interest and were, in effect, negligently issued do not, of course, determine the liability of the defendants. For all negligence is not actionable. To be actionable it must be the breach of a duty which the defendant owed the plaintiff as an individual or one of a class (Stowers v. Dwight Mfg. Co., 202 Ala. 252, 80 So. 90) and the plaintiff must not only show causal connection between the negligent breach of the duty but that such negligence was the proximate cause of the injury. Alabama Power Co. v. Bass, 218 Ala. 586, 119 So. 625, 63 A.L.R. 1.

The defendants below, the appellants here, assert with considerable emphasis in briefs filed in this court that there was no duty on them to determine whether Mrs. Dennison at the time the policies were issued had an insurable interest in the life of the plaintiff's minor daughter. Of course, if there was no such duty the defendants were entitled to the general affirmative charge with hypothesis, as requested.

Does a life insurance company have the duty to use reasonable care not to issue a policy of life insurance in favor of a beneficiary who has no interest in the continuation of the life of the insured?

No case has come to our attention where this specific question has been considered by any court. But we are of the opinion that such a duty exists, for there is a duty upon all to exercise reasonable care not to injure another. Weston v. National Manufacturers & Stores Corp., 253 Ala. 503, 45 So.2d 459; Railway Express Co. v. Real, 253 Ala. 489, 45 So.2d 306; Southeastern Greyhound Lines v. Callahan, 244 Ala. 449, 13 So.2d 660; Whiddon v. Malone, 220 Ala. 220, 124 So. 516; Southern Ry. Co. v.

Arnold, 162 Ala. 570, 50 So. 293; Merchants' Bank v. Sherman, 215 Ala. 370, 110 So. 805.

█ The position of the defendants seems to be that if murder results the insurance companies are, of course, sorry that the insured met with such a fate, but they have no liability if there is no insurable interest although they can treat such policies as completely void. If an early death from natural causes makes the policy unprofitable, the defendants can and do refuse to pay the beneficiary for the reason that such policies are void. In other words, the defendants seem to be of the opinion that the insurable interest rule is to protect insurance companies. We do not agree. The rule is designed to protect human life. Policies in violation of the insurable interest rule are not dangerous because they are illegal; they are illegal because they are dangerous.

As we have shown, it has long been recognized by this court and practically all courts in this country that an insured is placed in a position of extreme danger where a policy of insurance is issued on his life in favor of a beneficiary who has no insurable interest. There is no legal justification for the creation of such a risk to an insured and there is no social gain in the writing of a void policy of insurance. Where this court has found that such policies are unreasonably dangerous to the insured because of the risk of murder and for this reason has declared such policies void, it would be an anomaly to hold that insurance companies have no duty to use reasonable care not to create a situation which may prove to be a stimulus for murder.

The defendants say in their brief: "The adoption of the theory contended for on behalf of the plaintiff would place upon an insurance company an impossible burden." Yet in all three insurance policies involved in this case there is the statement that at one time or another the insurance company may require proof of insurable interest. Why is it any more of an "impossible burden" to require an insurance company to exercise reasonable care to determine whether the beneficiary has an insurable interest in the insured before it issues the policy of insurance than after the insured is dead? If the effort to determine the question of insurable interest is asserted before the issuance of the policy it may prevent the creation of the risk of murder. The purpose of such an inquiry made after death is to effectuate a saving to the insurance company of the payment of the amount of the insurance carried.

█ The fact that this precise question does not seem to have been brought before the courts on previous occasions cannot deter us from declaring that the duty which is upon all persons to exercise reasonable care not to injure another requires of life insurance companies the exercise of reasonable care not to issue policies of life insurance in favor of a beneficiary who has no interest in the continuation of the life of the insured, a policy which is void as against public policy because it opens "a wide door by which a constant temptation is created to commit for profit the most atrocious of crimes." Helmetag's Adm'r v. Miller, supra.

We come now to the contention of the appellants that they were entitled to the affirmative instruction presently under consideration for the reason that the plaintiff failed to meet the burden which was upon him to present some evidence tending to show that the defendants' acts were the proximate cause of Shirley's death. In their brief the defendants say that the evidence shows that "in the instant case, the *separate, independent, superseding, wilful, malicious, crime of murder* became 'the responsible cause' of the death of Shirley Dianne Weldon."

█ Persons who perpetrate torts are, as a rule, responsible and only responsible for the proximate consequences of the wrongs they commit. In other words, unless the tort be the proximate cause of the

injury complained of, there is no legal accountability. Our court has repeatedly dealt with and defined "proximate cause." Quite a number of definitions are quoted in Western Railway of Alabama v. Mutch, 97 Ala. 194, 11 So. 894, 21 L.R.A. 316; Mobile & Ohio R. Co. v. Christian Moerlein Brewing Co., 146 Ala. 404, 41 So. 17; Garrett v. Louisville & N. R. Co., 196 Ala. 52, 71 So. 685; and in Dye-Washburn Hotel Co. v. Aldridge, 207 Ala. 471, 93 So. 512. But there is very little use of reviewing our many cases where the question of proximate cause is involved. There are differences in almost every case, and ofttimes the case turns on a slight difference of facts. The general principles of law in relation thereto have been frequently stated and are not so difficult as is their application to the particular circumstances of each individual case.

█ Here we have an intervening cause, the criminal act of Mrs. Dennison. The many decisions of this court dealing with negligence as the proximate cause, when some agency has intervened and has been the immediate cause of the injury, hold the party guilty of negligence in the first instance is not responsible, unless at the time of the original negligence the act of the agency could have been reasonably foreseen. If the act of the intervening agency could have been reasonably foreseen the causal chain is not broken. But if the injury results from an independent, intervening, efficient cause, not reasonably to be anticipated, to wit, the act of a third person, the negligence shown, if any, is not the proximate cause of the injury. Clendenon v. Yarbrough, 233 Ala. 269, 171 So. 277; Louisville & N. R. Co. v. Maddox, 236 Ala. 594, 183 So. 849, 118 A.L.R. 1318; Louisville & N. R. Co. v. Courson, 234 Ala. 273, 174 So. 474, and cases cited; Mahone v. Birmingham Electric Co., 261 Ala. 132, 73 So.2d 378. That is the rule laid down by this and other courts with some slight variance in the language by which the thought is expressed, such as that the intervening event must be the "natural and rea-sonable" or "ordinary and natural" result of the initial negligence.

Appellants assert that a person is not liable for the intervening willful, criminal act of another. The case of Garrett v. Louisville & N. R. Co., supra, is cited and the opinion in that case does contain this language:

"After a full discussion of this subject, Mr. Freeman, in noting some differences in the cases where the subsequent act of the third person is merely negligent, concludes:

" 'But the courts, at least in this country, refuse to hold a tort-feasor liable for the results of a subsequent act which is willfully wrong, unless that act was actually intended by him.' Gibson v. Delaware, etc., Canal Co., 65 Vt. 213, 26 A. 70, 36 Am.St.Rep. 802, note, 807, 842, 843, citing the authorities." 196 Ala. 54, 71 So. 686.

But the decision in the Garrett case went off on the fact that the "willful independent" act of the third person was "neither intended nor *anticipated* by the defendant." We do not consider the Garrett case, supra, as being authority for the proposition asserted by the defendants.

The defendants put much emphasis on language used by the elder Mayfield in his opinion in Birmingham Ry., Light & Power Co. v. Ely, 183 Ala. 382, 62 So. 816, which they say "is the law of Alabama." They are mistaken. It is not the law of Alabama. The court did not agree with Judge Mayfield's holding that Count 1 in that case was subject to the demurrer interposed and the language upon which defendants rely was that used by Judge Mayfield in his effort to support his position. See Roach v. Wright, 195 Ala. 333, 335, 70 So. 271, 272, where Mr. Justice Anderson, writing for the court, said:

" * * * It is sufficient to say that count 1 was not subject to any of the grounds of demurrer, and the sufficiency of same is supported by the case,

cited by counsel for appellant. Birmingham R., L. & P. Co. v. Ely, 183 Ala. 382, 62 So. 816. It is true the opinion in said case condemns count 1 there considered, but it must be noted that the opinion was not concurred in by the court, as a majority held that said count was sufficient."

We have been cited to a number of cases from other jurisdictions by counsel representing the parties to this litigation which treat the matter of intervening criminal acts of third persons. It is, of course, quite impossible to review all of them in detail within the limits of an ordinary opinion. But our reading of the cases, not only those cited by the plaintiff, but many of those cited by the defendants, show the majority rule to be that stated in the Restatement of the Law of Torts by the American Law Institute, § 448, as follows:

"The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, unless the actor at the time of his negligent conduct should have realized the likelihood that such a situation might be created thereby and that a third person might avail himself of the opportunity to commit such a tort or crime.

\* \* \* \* -\* \*

"Comment:

"a. The rule stated in this Section applies when the actor's conduct creates a situation which is utilized by a third person to intentionally inflict harm upon another or provides a temptation thereto to which the third person yields, the actor having no reason to expect that the third person would so act. Under the rule stated in this Section, the actor is not responsible for the harm thus inflicted merely because the situation which his negligence has created has afforded an opportunity or temptation for its infliction.

"b. When special grounds for anticipating criminal action by third person. There are certain situations which are commonly recognized as affording temptations to which a recognizable percentage of humanity is likely to yield. So too, there are situations which create temptations to which no considerable percentage of ordinary mankind is likely to yield but which, if created at a place where persons of peculiarly vicious type are likely to be, should be realized as likely to lead to the commission of fairly definite types of crime. If the situation, which the actor should realize that his negligent conduct might create, is of either of these two sorts, an intentionally criminal or tortious act of the third person is not a superseding cause which relieves the actor from liability."

The following authorities appear to hold that whether or not an intervening act is criminal in nature is a fact to be considered in determining whether such act was reasonably foreseeable. But intervening criminal acts may be found to be foreseeable and, if so found, actionable negligence may be predicated thereon. McLeod v. Grant County School District No. 128, 42 Wash. 2d 316, 255 P.2d 360; Whitehead v. Stringer, 106 Wash. 501, 180 P. 486, 5 A.L.R. 358; Hines v. Garrett, 131 Va. 125, 108 S.E. 690; Southwestern Bell Telephone Co. v. Adams, 199 Ark. 254, 133 S.W.2d 867; Lillie v. Thompson, 332 U.S. 459, 68 S.Ct. 140, 92 L.Ed. 73; Brauer v. New York Central & H. R. Co., 91 N.J.L. 190, 103 A. 166, 1 A.L.R. 734; Mallory v. O'Neil, Fla., 69 So.2d 313; Jesse French Piano & Organ Co. v. Phelps, 47 Tex.Civ.App. 385, 105 S. W. 225; Williams v. Grier, 196 Ga. 327, 26 S.E.2d 698, 705; Henderson v. Dade Coal Co., 100 Ga. 568, 28 S.E. 251, 40 L.R.A. 95; Nichols v. City of Phoenix, 68 Ariz. 124, 202 P.2d 201; Levin v. Eleto Realty Corp., 157 Misc. 180, 283 N.Y.S. 105; Seith v. Commonwealth Electric Co., 241 Ill. 252, 89 N.

E. 425, 24 L.R.A.,N.S., 978; Livingston v. Seaboard Air Line R. Co., D.C. 106 F.Supp. 886; Aune v. Oregon Trunk Ry., 151 Or. 622, 51 P.2d 663; Strong v. Granite Furniture Co., 77 Utah 292, 294 P. 303, 78 A.L.R. 465; Davis v. Schroeder, 8 Cir., 291 F. 47; Scheffer v. Washington City, V. M. & G. S. R. Co., 105 U.S. 249, 26 L.Ed. 1070.

■ We cannot agree with the defendants in their assertion that we should hold as a matter of law that the murder of the young girl was not reasonably foreseeable. They created a situation of a kind which this court and others have consistently said affords temptation to a recognizable percentage of humanity to commit murder. We quote again from the case of Helmetag's Adm'r v. Miller, 76 Ala. 183: "The reason of the law which vitiates wager policies is the pecuniary interest which the holder has in procuring the death of the subject of insurance, *thus opening a wide door by which a constant temptation is created to commit for profit the most atrocious of crimes.*" (Emphasis supplied.)

The question of proximate cause was properly left for the jury's determination.

As we have heretofore observed, each of the counts in the complaint contains an averment to the effect that the wrongful or negligent acts of the three insurance companies concurred or united in proximately contributing to or causing the death of plaintiff's minor child. Defendants say there was a failure of proof in that regard and hence assert that the trial court erred in refusing to give the affirmative instruction presently under consideration. The proof which appellants say is absent and which they contend is essential was that going to show "that any defendant company knew what the other defendant companies were doing in this connection."

■ Such proof was not essential under this complaint. It has been settled in this state for a long time that if damage has resulted from concurrent, wrongful acts of two or more tort-feasors they may be sued jointly or severally and the act of each may be counted on as the proximate cause of the injury. Hall v. Seaboard Air Line R. Co., 211 Ala. 602, 100 So. 890; Watt v. Combs, 244 Ala. 31, 12 So.2d 189, 145 A.L.R. 667; Caudle v. Birmingham Electric Co., 247 Ala. 34, 22 So.2d 417; Campbell v. Jackson, 257 Ala. 618, 60 So.2d 252; Downes v. Norrell, 261 Ala. 430, 74 So.2d 593. Equally well settled by the cases just cited and others is the rule that it is not necessary that a plaintiff aver or prove facts showing a common design, a concert of action, or knowledge by one plaintiff of the acts of the other tort-feasors. Where the plaintiff has sued the defendants jointly, there being no question of respondeat superior, "a recovery may be had as to all, or any number less than all, according to the proof." Hubbard v. Thrasher, 26 Ala.App. 252, 157 So. 680, 682; Southern Ry. Co. v. Arnold, 162 Ala. 570, 50 So. 293; Title 7, § 139, Code 1940.

We believe that there was presented a question for the determination of the jury as to the liability of the defendants. Accordingly we hold that the trial court did not err in refusing the affirmative charge with hypothesis as requested by the defendants.

Assignment of Error No. 54 of each appellant is to the effect that the trial court erred in overruling defense objections to the introduction in evidence of a little dress or sun suit which Shirley wore at the time she drank the drinks given her by Mrs. Dennison. We cannot agree. A material allegation of each of the counts of plaintiff's complaint was that Mrs. Dennison murdered Shirley. That was one of the issues in the case and the burden of proof was on the plaintiff to show that Mrs. Dennison murdered the little girl. The autopsy showed that Shirley died of arsenic poisoning and there was evidence of the State Toxicologist going to show that the dress or sun suit which was admitted in evidence had become contaminated from her regurgitation and contained a considerable quantity of arsenic poisoning.

■ The pertinent rule is that articles or objects which relate to or tend to elucidate or explain the issues or form a part of the transaction are admissible in evidence when duly identified and shown to be in substantially the same condition as at the time of the occurrence. The preliminary proof identifying and describing the dress or sun suit complied with the rule and that article was admitted in evidence without error. Dennison v. State, 259 Ala. 424, 66 So.2d 552, and cases cited; Northern Alabama Ry. Co. v. Mansell, 138 Ala. 548, 36 So. 459; Burdett v. Hipp, 252 Ala. 37, 39 So.2d 389.

■ Assignment of Error No. 59 of each appellant reads: "The Court erred in overruling this defendant's motion for a mistrial based upon the improper statements of counsel for the plaintiff made in the presence of the jury." (R. 721–729.) This court has held in several cases that assignments of error couched in such general language will not be considered. Hall v. Pearce, 209 Ala. 397, 96 So. 608; Jackson Lumber Co. v. Butler, 244 Ala. 348, 13 So.2d 294; Almon v. Commission of Education of Cullman County, 265 Ala. 489, 92 So.2d 35, and cases there cited. Assignment of Error No. 59 does not spell out the improper statements of which defendants complain and an examination of pages 721–729 of the record, which pages are referred to in the assignment of error, shows that all that is recorded on those pages took place out of the presence of the jury and at a time when the defendants' witness Eugene A. Keener was on the witness stand. The argument made by counsel for the appellants in support of Assignment of Error No. 59 in no way relates to anything that occurred during the examination of the witness Keener. Apparently that argument is in connection with the action of the trial court in refusing to declare a mistrial because of the unsuccessful effort of counsel for the plaintiff below, the appellee here, to introduce into evidence a brief filed by Southern Life in a Texas Court wherein Southern Life set out the insurable interest rule in defense of a suit against it on an insurance policy. (R. pp. 510–574.) No ruling of the trial court in that connection is assigned as error.

We hold that Assignment of Error No. 59 does not present cause for reversal.

■ Assignment of Error No. 62 of each appellant reads: "The Court erred in entering an order on the 20th day of August, 1954, overruling this defendant's motion for a new trial." A general assignment of error on appeal grounded on the refusal of the trial court to grant a motion for a new trial is sufficient to invite a review of that ruling as to any ground well stated in the motion and properly argued by appellant. Grimes v. Jackson, 263 Ala. 22, 82 So.2d 315.

The only grounds of the motions for new trial which appellants argue in support of Assignment of Error No. 62 are those which take the point that the verdict is grossly excessive.

■ Section 119, Title 7, Code 1940, the statute under which this action was brought, provides that for the wrongful death of a minor child the persons there entitled to sue, if entitled to a verdict, "shall recover such damages as the jury may assess." The damages are entirely punitive, imposed for the preservation of human life. Louisville & N. R. Co. v. Bogue, 177 Ala. 349, 58 So. 392. As the wording of the statute indicates, the amount of damages rests largely in the discretion of the jury. However, this discretion is not an unbridled or arbitrary one, but "a legal, sound and honest discretion." Mobile Light & R. Co. v. Nicholas, 232 Ala. 213, 167 So. 298, 305. In arriving at the amount of damages which should be assessed, the jury should give due regard to the enormity or not of the wrong and to the necessity of preventing similar wrongs. The punishment by way of damages is intended not alone to punish the wrongdoer, but as a deterrent to others similarly minded. Mobile Light & R. Co. v. Nicholas,

supra; Louisville & N. R. Co. v. Bailey, 245 Ala. 178, 16 So.2d 167; Shirley v. Shirley, 261 Ala. 100, 73 So.2d 77.

The verdict rendered in this case is large, perhaps the largest to come before this court in a case brought under the so-called homicide statute, §§ 119 and 123, Title 7, Code 1940. But the trial court refused to disturb the amount of the verdict and we have held that when such is the case we will not order a reduction unless the verdict is so excessive as to indicate passion, prejudice, corruption or mistake. Montgomery City Lines, Inc., v. Davis, 261 Ala. 491, 74 So.2d 923; Louisville & N. R. Co. v. Tucker, 262 Ala. 570, 80 So.2d 288; National Biscuit Co. v. Wilson, 256 Ala. 241, 54 So.2d 492; City of Mobile v. Reeves, 249 Ala. 488, 31 So.2d 688. We are unwilling to say that the amount of damages awarded by way of punishment of these three appellants for wrongfully and negligently issuing illegal policies of insurance, the issuance of which the evidence clearly shows led to the murder of plaintiff's young daughter, is so excessive as to indicate passion, prejudice, corruption or mistake, and as we have heretofore shown, the jury in fixing the amount of the verdict was charged with the duty of giving consideration to the necessity of preventing the same wrongs by others similarly minded.

We hold that the trial court did not err in overruling those grounds of the motion for new trial which are argued here as having been well taken.

We come now to a consideration of those assignments of error argued in the brief of appellants which do not apply to all of them.

Liberty National's Assignment of Error No. 66 P is based on the refusal of the trial court to give its written requested charge L36, which reads: "I charge you that if you believe the evidence in this case you cannot find for the plaintiff against the defendant, Liberty National Life Insurance Company."

In support of its contention that the trial court erred in refusing to give the above-quoted affirmative instruction, Liberty National asserts that the policy it issued to Mrs. Dennison covering the life of Shirley is an industrial policy which requires no insurable interest on the part of the beneficiary in the life of the insured, hence, the issuance of the policy could not have constituted a wrongful or negligent act as claimed by the appellee, the plaintiff below.

In State ex rel. Highsmith v. Brown Service Funeral Co., 236 Ala. 249, 252, 182 So. 18, 20, this court observed: "True, industrial insurance is a form of life insurance, but it is distinctive in character and is classed in the Code with mutual aid and benefit insurance, though it has features distinctive from them as well as from ordinary and other old line insurance." But the distinctions were not pointed out in that case and in so far as we are advised neither this court nor the legislature has undertaken to define industrial insurance, although Art. 1, Chapter 10, of Title 28, Code 1940, deals with "Mutual Aid, Benefit or Industrial Companies or Associations."

The courts of some other states have said that in a general sense, "industrial insurance" means policies issued in small amounts in consideration of weekly payments, as distinguished from ordinary insurance, which is usually in large amounts and maintained by annual, semi-annual or quarterly premiums. Russell v. Prudential Ins. Co. of America, 176 N.Y. 178, 68 N.E. 252; Life & Casualty Ins. Co. v. King, 137 Tenn. 685, 195 S.W. 585; Prudential Ins. Co. of America v. Howell, 144 Okl. 166, 289 P. 734; Prudential Ins. Co. of America v. Hill, 174 Okl. 33, 49 P.2d 1067; Krumphorn v. John Hancock Mut. Life Ins. Co., 272 Ky. 719, 114 S.W.2d 1125; Old Surety Life Ins. Co. of Alva, Okl. v. Morrow, 195 Okl. 422, 158 P.2d 715; Gontrum v. Union Liberty Life Ins. Co., 177 Md. 624, 11 A.2d 625, 627.

The case last cited is one of the two cases cited by Liberty National in support

of this assignment of error. In that case industrial insurance is described thusly: "It is a form of insurance written for a small limited amount payable at death, in consideration of a premium collected at short, fixed intervals, and is not unlike burial insurance, or death benefits, since its benefits ordinarily accrue to the insured rather than to another." In Fulcher v. Parker, 169 Va. 479, 194 S.E. 714, the other case cited by Liberty National in connection with the matter presently under consideration, it was said in part as follows: "Industrial insurance is designed to meet the immediate need of those usually in indigent circumstances, and to cover expenses of one's last illness, burial, etc."

Liberty National's policy presenty under consideration is labeled "Special Monthly Endowment Insurance" on the cover and is described as "Endowment Insurance" on the front page, but it is in a comparatively small amount, $500, and the premiums were payable monthly.

However, the policy would have matured on the anniversary following insured's seventeenth birthday, and at such time the proceeds were payable to the insured, unless prior payment had been made by the death of the insured. This manner of payment certainly was not the creation of a funeral and burial fund. Several options were provided for any proceeds going to the beneficiary by reason of the death of the insured. Option No. 1 is cash, Option No. 2 is installment payments of $10 per week, which is in our opinion wholly inconsistent with the general objective of "industrial insurance" as stated in the cases referred to above. In view of these distinctions we are unwilling to say that Liberty National's policy was one of "industrial insurance."

But even if we be in error in our conclusion that the policy here under consideration is not one of "industrial insurance," we are clearly of the opinion that it is not that kind of policy which the courts of some states have held to require no insurable interest on the part of the beneficiary in the life of the insured.

It is not every small policy which provides for premium payments to be collected at short, fixed intervals that some courts have excepted from the general rule that requires the beneficiary to have an insurable interest in the life of the insured. That exception applies only when the policy has a facilitating clause whereby the company is allowed to pay the amount due under the policy to the beneficiary or to the one who may appear to the company to be equitably entitled thereto. In the case of Fulcher v. Parker, supra, relied upon by Liberty National, two of the policies involved did not name a beneficiary and the other contained a facilitating clause of the kind outlined above. That the exception is so limited is demonstrated by that part of the opinion of the Court of Appeals of Kentucky in Newton v. Hicks' Adm'r, 282 Ky. 226, 138 S.W.2d 329, hereafter quoted:

"* * * Where an industrial policy contains a facilitating clause allowing the company to pay the amount due under the policy to the beneficiary, or to the one who may appear to the to, the Nelson case [Metropolitan Life company to be equitably entitled there- Ins. Co. v. Nelson, 170 Ky. 674, 186 S.W. 520, L.R.A.1916F, 457] draws a distinction between ordinary life and industrial insurance, and excepts the latter from the general rule that one without an insurable interest in the life of another may not collect the policy; and such distinction was followed in the recent case of Krumphorn v. John Hancock Mut. Life Ins. Co., 272 Ky. 719, 114 S.W.2d 1125. The Krumphorn and Nelson cases define industrial insurance as small policies with weekly premiums, the purpose of which is not to augment insured's estate or to care for his dependents, but to provide for insured's last illness and a decent burial. While the Nelson case allows one having no

insurable interest in the life of another to recover on an industrial policy containing a facilitating clause, *yet it expressly says, there is no abrogation of the general rule that one without an insurable interest in the life of another cannot carry an insurance policy on such person, and the exception applies only to industrial insurance containing a facilitating clause* where 'the size of the policy is not beyond a sum reasonably certain to accomplish the purpose intended (to provide for last illness and burial), and good faith is shown by all parties concerned.' *. * *"* (Emphasis supplied.) 138 S.W.2d 331.

There is a clause in the policy issued by Liberty National and involved in the instant case which reads as follows:

"Beneficiary.—By written notice to the Company the Insured may from time to time name a new beneficiary, subject to evidence of insurable interest satisfactory to the Company, but no such change shall be effective until endorsed on this policy by the Company.

"If the beneficiary die before the Insured the Estate of the Insured shall then automatically become the Beneficiary thereof. If the *beneficiary fail to file claim with the Company within sixty days after the death of the Insured, then the Company may make payment to any relative by blood or marriage, or to any person appearing to the Company to be equitably entitled to such payment because of having incurred expense for the maintenance, medical attention or burial of the Insured.* If the Beneficiary is a minor, or is otherwise not legally qualified to give a valid release at the time of payment hereof the Company may make payment to any person who furnishes evidence satisfactory to the Company that such person is responsible for, or is actually contributing to the support of the Beneficiary." (Emphasis supplied.)

Under the provisions quoted above, the insured could not change the beneficiary within written notice to the company and then only upon "evidence of insurable interest satisfactory to the Company." That part of the quoted clause which we have italicized does provide that "the Company may make payment to any relative by blood or marriage, or to any person appearing to the Company to be equitably entitled to such payment because of having incurred expense for the maintenance, medical attention or burial of the Insured," but that right exists only in the event "the Beneficiary fail to file a claim with the Company within sixty days after the death of the Insured." The right of the beneficiary within the sixty-day period following the death of the insured to demand payment of the proceeds of the policy refutes the contention of Liberty National that the clause here under consideration has the same effect as the true facility of payment clauses contained in some of the policies involved in the Virginia and Kentucky cases to which we have alluded.

There is yet another reason why we cannot agree with the assertion of Liberty National to the effect that its policy required no insurable interest. Regardless of the type of insurance or what it may be called, Liberty National purported to issue a contract of insurance and § 2, Title 28, Code 1940, provides: "A contract of insurance is an agreement, express or implied, by which one party, for a consideration, promises to pay money, or its equivalent, or to do some act of value to the assured, upon the destruction or injury of something in which the other party has an insurable interest." We find no legislative enactment or judicial decision limiting the language of the provisions just quoted. Section 273, Title 28, Code 1940, in our opinion does not have that effect.

In view of the foregoing, we hold that there is no merit in Liberty National's Assignment of Error No. 66 P.

Southern Life's Assignment of Error No. 66 K challenges the action of the trial court in refusing to give its requested written charge S19, which reads: "The court charges the jury that, if you believe the evidence in this case, you cannot find a verdict in favor of the plaintiff and against the Southern Life & Health Insurance Company under Count 1 of the complaint as amended."

█ Southern Life did not issue its policy until after it had received a medical certificate signed by a licensed physician of this state. This certificate was to the effect that the doctor whose name was signed thereto had examined Shirley and had found her and her parents to be in good health; that the living conditions and moral character of the parents or guardian were not such as would effect the risk; that the examination was conducted in the child's home; and, that he "advised the risk without qualification." This certificate is completely false. The doctor had not examined the child nor had he ever visted in her home. He was unfamiliar with her surroundings. However, he apparently had confidence in Mrs. Dennison and at her request signed a blank medical certificate which Mrs. Dennison apparently completed later and which she then sent to Southern Life.

But the fraud of Mrs. Dennison and the negligence or fraud of the doctor is in our opinion utterly immaterial as a defense to the charge that Southern Life wrongfully issued the policy in that it failed to discharge the duty upon it to take reasonable steps to determine that Mrs. Dennison had an insurable interest in the insured. There is nothing in the certificate which even remotely bears on the question of insurable interest and neither the child nor her parants had anything to do with the execution of that false certificate.

We hold that there is no merit in the argument made by Southern Life in support of its Assignment of Error No. 66 K.

National Life's Assignment of Error No. 66 A questions the action of the trial court in refusing to give its written requested charge 1 N, which reads: "The Court charges you that if you believe the evidence in this case you cannot find for the plaintiff and against the defendant the National Life and Accident Insurance Company."

█ The argument made by National Life in support of its contention that the trial court erred in refusing to give the above-quoted affirmative instruction is to the effect that there is an entire absence of evidence going to show that the National Life policy could have been an inducement for Mrs. Dennison to murder Shirley inasmuch as she had no knowledge of the fact that the policy had been issued.

The application for the National Life policy signed by Mrs. Dennison bears date of April 7, 1952, but the evidence shows that she actually signed it several days prior thereto. It was on that day that Mrs. Dennison paid the first month's premium which had to accompany the application, so apparently it was that date which the agent of National Life inserted in the application. At the time Mrs. Dennison paid the first month's premium, which is also referred to as a "deposit," she was given a receipt signed by National Life's duly authorized agent which in pertinent part reads:

"* * * Such deposit will be returned (a) if application is declined or (b) if a policy is issued other than as applied for and Applicant declines to accept it. No insurance is in force on such application unless and until a policy has been issued thereon and delivered in accordance with the terms of such application except that when such deposit is equal to the full first premium on the policy applied for and such application is approved at the Home Office of the Company for the Class, Plan and Amount of insurance and at the rate of Premiums as so ap-

plied for, then, without affecting the Insurance Date and anniversaries thereof as set forth in the policy, the insurance applied for will be in force from the date of this receipt, but no obligation is assumed by the Company unless and until such application is so approved.

\*   \*   \*   \*   \*   \*

"\* \* \* If the application for the policy applied for is declined or postponed by the Company, the amount deposited must be returned to Applicant who will receipt for it below."

The application was accepted by National Life on or about April 23, 1952. The policy issued thereon bears date of April 25, 1952. The policy was mailed to National Life's agent in Wetumpka, Alabama, on or about April 29, 1952. The agent had not delivered the policy to Mrs. Dennison at the time of Shirley's death. He had the policy in his pocket at that time. According to the agent's testimony, he had not notified Mrs. Dennison of the fact that her application had been accepted or that the policy had been issued and mailed to him. His testimony was to the effect that he had not had any conversations whatsoever with Mrs. Dennison subsequent to the date on which she paid the "deposit," April 7, 1952.

Aside from the lack of insurable interest, it seems clear that under the evidence set out above the National Life policy was "in force" at the time of Shirley's death, inasmuch as Mrs. Dennison had accompanied her application with a "deposit" which was "equal to the full first premium on the policy applied for" and the application had been approved by the home office of that company several days prior to the child's death. Under the terms of the "receipt" those circumstances were sufficient to cause the policy to be "in force" at the time of Shirley's death, assuming the beneficiary had an insurable interest. In other words, it would appear that if the question of insurable interest was not involved, National Life could not have successfully defended against a claim under the policy, if Shirley had died a natural death on May 1, 1952, on the ground that National's agent had neither delivered the policy to Mrs. Dennison nor notified her that it had been issued prior to the child's death.

Under the averments of this complaint, plaintiff was not entitled to recover against National Life simply on proof that the policy had been "in force" if Mrs. Dennison had had an insurable interest in Shirley's life. National Life was entitled to an affirmative instruction in its favor unless the evidence is sufficient to support a reasonable inference that Mrs. Dennison knew that the policy had been issued, inasmuch as the complaint charges that the issuance of the National Life policy acted as an inducement to Mrs. Dennison to murder Shirley.

There is no direct evidence going to show that Mrs. Dennison had knowledge of the fact that the National Life policy had been issued at the time she killed the child. But the rule is well established that in reviewing the action of the trial court in refusing the affirmative instruction requested by defendant, we review the tendencies of the evidence in the light most favorable to plaintiff and we must allow such reasonable inferences as the jury was free to draw, not inferences which we may think the more probable. Carraway Methodist Hospital v. Pitts, 256 Ala. 665, 57 So.2d 96; Tyler v. Drennen, 255 Ala. 377, 51 So.2d 516; Smith v. Lawson, 264 Ala. 389, 88 So. 2d 322. If from the proven facts and circumstances a reasonable inference may be drawn to substantiate the claimed culpability of National Life, then its affirmative instruction was properly refused. Birmingham Electric Co. v. McQueen, 253 Ala. 395, 44 So.2d 598; Sullivan v. Alabama Power Co., 246 Ala. 262, 20 So.2d 224; Aircraft Sales & Service Co. v. Gantt, 255 Ala. 508, 52 So.2d 388.

We think the fact that Mrs. Dennison did not act until after the National Life policy reached Wetumpka is sufficient to support a finding by the jury, under all of the cir-

cumstances of this case, that Mrs. Dennison had learned in some way that the policy had in fact been issued. The evidence tends to show that Mrs. Dennison's plot to end the life of Shirley as a means of securing money began as early as December 1, 1951, when Liberty National's policy was issued and delivered to her. The evidence further tends to show that the policy of Southern Life had been delivered to Mrs. Dennison prior to the time she made application to National Life, so at that time she had insurance on the child's life in the amount of $5,500. However, she did not act until after the National Life policy had been received by that company's representative in the city where she worked and where her application had been taken. As stated above, we think these circumstances sufficient to present a question for jury decision as to whether the issuance of the National Life policy acted to induce Mrs. Dennison to murder plaintiff's minor daughter.

We hold that National Life's Assignment of Error No. 66A does not present cause for reversal.

 Knowledge may be established by circumstantial evidence even in the face of professions of ignorance. Kuchlik v. Feuer, 239 App.Div. 338, 267 N.Y.S. 256, affirmed 264 N.Y. 542, 191 N.E. 555; Woloszynowski v. New York Central R., 254 N.Y. 206, 172 N.E. 471.

The judgment of the circuit court is affirmed.

Affirmed.

LIVINGSTON, C. J., and SIMPSON, GOODWYN and MERRILL, JJ., concur.

COLEMAN, J., dissents as indicated.

COLEMAN, Justice (dissenting).

I agree with the opinion of the majority except the holding that National Life was not entitled to the affirmative charge.

The opinion states that "National Life was entitled to an affirmative instruction in its favor unless the evidence is sufficient to support a reasonable inference that Mrs. Dennison knew that the policy had been issued * * *" and "There is no direct evidence going to show that Mrs. Dennison had knowledge of the fact that the National Life policy had been issued at the time she killed the child."

A conclusion that Mrs. Dennison had such knowledge must, therefore, rest on a reasonable inference from the matters as to which there was evidence. The majority appear to reason that since she could have had knowledge, the jury is permitted to conclude that she did have knowledge.

As it appears to me, such knowledge on the part of Mrs. Dennison, under all the circumstances of the case, does not follow as a reasonable conclusion from the fact that she did not act until after the policy reached Wetumpka. Such a conclusion, as I see it, rests on speculation or conjecture rather than reasonable inference.

Therefore, in the particular noted, I respectfully dissent.